# Exhibit A


**EMILY CHIANG**
*LEGAL DIRECTOR*

**NANCY TALNER**
*SENIOR STAFF ATTORNEY*

**LA ROND BAKER**
**PRACHI DAVE**
*STAFF ATTORNEYS*

**MARGARET CHEN**
*FLOYD AND DELORES JONES FAMILY STAFF ATTORNEY*

**BREANNE SCHUSTER**
*VOTING RIGHTS RESEARCHER*



March 2, 2016

Pasco City Council
Care of Leland Kerr,
Pasco City Attorney
Kerr Law Group
7025 W. Grandridge Blvd. Ste. A
Kennewick, WA 99336-7826

**AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION**
901 FIFTH AVENUE #630
SEATTLE, WA 98164
T/206.624.2184
F/206.624.2190
WWW.ACLU-WA.ORG

**JEAN ROBINSON**
*BOARD PRESIDENT*

**KATHLEEN TAYLOR**
*EXECUTIVE DIRECTOR*

Re:   **Pasco City Council Election System**

Dear Members of the Pasco City Council,

On February 23, we spoke with the Pasco City Attorney, Leland Kerr, Pasco City Manager, Dave Zabell, Pasco Deputy City Manager, Stan Strebel, and Briahna Murray and Alex Soldano, lobbyists for the City, about the City's election system. On that call, representatives of the City expressed support for state legislation that would change Washington state law to allow the City to affirmatively change its election system to a district based system.  One such vehicle for doing so is the Washington Voting Rights Act ("WVRA"), which is currently pending in the state senate.  However, passage of the WVRA is by no means a given.

We accordingly write this letter to advise you of the ACLU of Washington's position on Pasco's compliance with the federal Voting Rights Act, and to offer our assistance to the City as you evaluate your legal and political options moving forward.  We recognize the difficult position the City is in because of its classification as a non-charter code city, but believe that we can work together with you to ensure legally adequate representation for all of Pasco's constituents.

*First*, the ACLU's position is that Pasco's current election system is in violation of Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973 (a).  The City's at-large method of electing City Council members unlawfully dilutes the Latino/a vote and effectively prevents Latinos from meaningful participation in City Council elections. As you know, Section 2 prohibits voting standards, practices, and procedures that result "in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973 (a).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  A Section 2 vote dilution claim is results based and, as such, *does not require proof that the election system was adopted with the intent to discriminate*.  *U.S. v. Blaine County*, 363 F.3d 897, 909 (9th Cir. 2004).

March 2, 2016
Page 2

Establishing a vote dilution claim and challenging a particular election system requires proof of three elements: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district"; (2) the minority group is politically cohesive; and (3) there is a bloc voting majority that can usually defeat the minority preferred candidate. *Gingles*, 478 U.S. at 50-51. These last two elements are often considered together and referred to as "racially polarized voting."

Once these three preconditions are proven, a court will consider whether "under the totality of the circumstances the at-large voting system operates to prevent the minority group from participating equally in the political process and electing representatives of its choice." *Blaine County*, 363 F.3d at 903; 42 U.S.C. § 1973 (b). A court may examine several objective factors in this analysis, often referred to as the "Senate factors." These factors include:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, vote, or otherwise participate in the democratic process;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) the extent to which the state or political subdivision has voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
(6) whether political campaigns have been characterized by overt or subtle racial appeals;
(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417 at 28-29. U.S. Code Cong. & Admin. News at 205-07).

These factors are neither "comprehensive nor exclusive" nor is there a requirement that "a particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 30, 45. The Ninth Circuit has placed significant weight on factors two and seven—the existence of racially polarized elections and the extent to which minorities have been elected. *Blaine County*, 363 F.3d at 903; *Gomez v. City of Watsonville*, 863 F.2d 1407, 1413 (9th Cir. 1988).

March 2, 2016
Page 3

Pasco currently uses a modified district based election system, which is the same type of system the City of Yakima used prior to the *Montes* lawsuit. Under the current system, two City Council members are elected at large and five members, by title, represent districts. Districts are only relevant for primary elections; all seven City Council members are elected at large during the general election, with every city resident casting their vote regardless of whether or not they live in the candidate's district. Since this election system was adopted 45 years ago, *not one* Latino/a has been elected to the City Council when running against a non-Latino/a candidate. Only one Latino has ever even served on the City Council, and he was first appointed to the Council and subsequently ran unopposed.

This lack of representation can neither be attributed to political apathy nor disinterest on the part of the Latino/a community: a Latino/a candidate has run almost every time a City Council seat has been up for election in the past 15 years, and six Latinos ran for City Council in this past election. For example, in 2015, the Latina candidates who advanced from the primary election were largely favored by the Latino community, but due to Pasco's election system, were ultimately unsuccessful in the general election.

Depending on these circumstances for representation is untenable for the Latino/a community and is impermissible under the Voting Rights Act.

*Second*, the ACLU would be more than happy to work with the City to resolve the current illegality of its election system—and believes that engaging in this work will be necessary *regardless of whether the WVRA passes*.[1]

To comport with Section 2 of the federal Voting Rights Act, the current election system must be replaced with one that provides the possibility for the Latino/a community to participate equally in the election process. *See* 42 U.S.C. § 1973. As we discussed on the phone, one way the City can accomplish this is to adopt a seven single member district based election system in which only voters residing in the election district can vote to elect the representative of that election district.

The ACLU has contracted with a nationally recognized demographer who has conclusively found that there are a variety of ways in which Pasco can draw seven single member districts that would comply with all applicable legal requirements and achieve adequate representation for Latino/a community members.[2] His work

---

[1] If no legislative fix issues from this session, Pasco can still remedy the vote dilution problems that arise from its current election system. This is because a federal court has the authority to issue a remedy for voter dilution claims under the Voting Rights Act even if that remedy conflicts with state law. This authority includes the ability to approve a settlement or issue a consent decree that violates or modifies state law. *Missouri v. Jenkins*, 495 U.S. 33, 57 (1990).

[2] William S. Cooper has prepared proposed redistricting maps for more than 600 jurisdictions for use in Section 2 litigation and other Voting Rights Act compliance actions, analyzed and prepared elections plans in over 100 jurisdictions, and developed statewide legislative plans in at least five states.

March 2, 2016
Page 4

indicates that Pasco could easily create three districts in which Latinos would make up a majority both in sheer population *and* in citizen voting age population. We would be happy to share this information with you at no charge—in large part because our conversation with you leads us to believe that you are considering a plan that would retain two at large seats and provide for only two majority Latino/a districts.

It is our goal to support the City of Pasco's efforts to ensure that your election system complies with the Voting Rights Act and provides the Latino/a community with an equal opportunity to elect representatives of their choice. We believe the City has the opportunity to amicably resolve this matter and would welcome an in-person meeting with you to discuss how best Pasco can comply with the law. Thank you for your time and consideration in this matter.

Sincerely,

Emily Chiang
Legal Director