1

HON. LONNY R. SUKO

2 Leland B. Kerr, WSBA No. 6059
lkerr@kerrlawgroup.net
3 KERR LAW GROUP
7025 W. Grandridge Blvd., Ste. A
4 Kennewick, WA 99336
(509) 735-1542
5

6 John A. Safarli, WSBA No. 44056
jsafarli@floyd-ringer.com
FLOYD, PFLUEGER & RINGER, P.S.
7 200 W. Thomas Street, Ste. 500
Seattle, WA 98119
8 (206) 441-4455

9 *Attorneys for Defendants*

10          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF WASHINGTON
11

12 BERTHA ARANDA GLATT                     Case No. 4:16-CV-05108-LRS

13          Plaintiff,                     REPLY IN SUPPORT OF
                                           DEFENDANTS' MOTION
                                           FOR ENTRY OF PROPOSED
14     v.                                  REMEDIAL PLAN AND
                                           FINAL INJUNCTION
15 CITY OF PASCO, *et al.*,

          Defendants.                      **12/7/16**
16                                         **With oral argument: 1:00 P.M.**

17

18

19

20

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

# I.  **INTRODUCTION**

Plaintiff continues to level the same criticism of the City's proposed remedial plan: Because the plan contains a single at-large position, it is allegedly not a full and complete remedy of the Section 2 violation. This criticism is unfounded and relies on a distortion of the legal standard for evaluating proposed remedial plans.

There is no categorical prohibition against the inclusion of at-large positions in legislatively-proposed plans. Indeed, one court has noted that such a *per se* rule "would be in direct contradiction of both the intentions of Congress in enacting the 1982 amendments to the Voting Rights Act and Supreme Court precedent." *NAACP v. Kershaw Cnty.*, 838 F. Supp. 237, 241 (D.S.C. 1993) (internal citation omitted). Plaintiff cites cases where hybrid plans (*i.e.*, those with both at-large positions and single-member districts) were rejected, then erroneously infers that the plans were rejected *because* they were hybrid. Plaintiff confuses correlation with causation. The fair reading of the cases establish that the plans were rejected for reasons other than their inclusion of at-large positions.

Plaintiff's criticism also does not withstand logical scrutiny. Plaintiff contends that the existence of racially-polarized voting precludes the use of at-large positions in legislatively-proposed plans. But racially-polarized voting is a necessary element of a Section 2 claim and therefore will exist in every Section 2

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 1

lawsuit that progresses to the remedy phase. According to Plaintiff's logic, however, at-large positions are prohibited in every legislative plan proposed during the remedial phase. But that is not the law.

The relevant inquiry is not whether the legislatively-proposed plan includes an at-large position, but whether the position was included "'solely to diffuse [minority] voting strength.'" *Kershaw Cnty.*, 838 F. Supp. at 242 (quoting *Hines v. Ahoskie*, 998 F.2d 1266, 1271 (4th Cir. 1993)). The City's years-long efforts to voluntarily change its own election system and promote legislation to provide electoral opportunities to Latinos, *see* ECF No. 25 at 5-10, evince that the at-large position was included for legitimate public policy reasons,[1] not to dilute the Latino vote.

Additionally, courts must determine whether the plan provides the minority group with proportional representation. An electoral scheme does not violate Section 2 "where, in spite of continuing . . . racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." *Johnson v. DeGrandy*, 512 U.S. 997, 1000 (1994). Here, the City's plan provides Latinos with control over three out of seven seats, which is proportional to the Latino

---

[1] Plaintiff acknowledges these reasons are "laudable." ECF No. 27 at 1.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 2

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119
TEL 206 441-4455
FAX 206 441-8484

share of the eligible voter population. This is the maximum number of seats that can be provided to Latinos for a seven-member body, and the same number of seats offered by Plaintiff's plan.

"A district court may reject the defendant's proposal under only one condition: if that proposal 'is legally unacceptable because it violates anew constitutional or statutory voting rights – that is, [if] it fails to meet the same standards applicable to an original challenge of a legislative plan in place.'" *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) (quoting *McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988)). "That single question ends the Court's inquiry." *Id.* The City's plan does not violate any constitutional or statutory voting rights. To the contrary, it provides Latinos with "the maximum *available* 'opportunit[ies] to elect representatives of their choice.'" *Hines*, 998 F.2d at 1273 (quoting 42 U.S.C. § 1973, *recodified as* 52 U.S.C. § 10301)). Because the plan is legally acceptable, this Court must adopt it. *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 749-50 (citing *Wise v. Lipscomb*, 437 U.S. 535, 539-41 (1979) (plurality)).

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 3

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

## II. <u>ADDITIONAL DATA</u>

Defendants' demographer has performed geocoding analysis to determine the Latino share of registered voters in each of the City's six single-member districts and the City as a whole.[2] Courts routinely look to the registered voter population in evaluating remedial plans. *See*, *e.g.*, *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) ("The court may consider, at the remedial stage, what type of remedy is possible based on the factors traditionally examined in single-member districts, such as minority voter registration and turn-out rates.")

Geocoding is a standard process used in voting rights cases. Geocoding "involves the use of voter registration data, which includes address information . . . to match voters with their addresses and place them within census blocks." *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1292 (S.D. Fla. 2002). Defendants obtained the October 2016 list of registered voters from the Franklin County Auditor. Using software, registered voters were pinpointed on a map based on their address. The boundaries of each single-member district are overlaid on the map, which shows registered voters who live inside the district. The final step of

---

[2] *See* Reply Declaration of John A. Safarli, Exhibit 1 (First Supplemental Report of Peter Morrison, Ph.D.), ¶¶ 7-9.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 4

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119
TEL 206 441-4455
FAX 206 441-8484

the geocoding process involves sorting the names of registered voters to identify

who has a Spanish surname.

This geocoding process shows that the City's proposal contains three

majority-minority districts as measured by eligible voters and registered voters:

| District | Latino eligible voter % (LCVAP) (2010-2014 5-year ACS) | Latino registered voter % |
|---|---|---|
| 1 | **54.0%** | **59.2%** |
| 2 | **52.3%** | **65.8%** |
| 3 | 27.3% | 22.9% |
| 4 | 23.6% | 21.7% |
| 5 | 13.0% | 16.0% |
| 6 | **56.0%** | **66.1%** |

As shown above, Districts 1, 2, and 6 have eligible voter and registered

voter populations that are more than 50% Latino. Districts 2 and 6 have

registered voter populations that are more than 60% Latino (and District 1 is not

far behind). There is no doubt that the City's proposal provides Latinos with

three opportunities to elect their candidates of choice, which is proportional to the

Latino share of the eligible voter population and the maximum number of

majority-minority districts available.

Critically, Defendants' geocoding analysis shows that Latinos have a

substantial share of both the citywide registered voter population and eligible

voter population:

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 5

| | |
|---|---|
| Latino share of citywide eligible voter population (2010-2014 5-year ACS estimate) | 31.9% |
| Latino share of citywide eligible voter population (2015 1-year ACS estimate)[3] | 38.5% |
| Latino share of citywide registered voter population | 31.8%[4] |

[3] Plaintiff complains that the 2015 1-year ACS should not be used because it is less accurate than the 2010-2014 5-year ACS estimate. But the U.S. Census Bureau's own guidelines approve of using 1-year estimates in areas with total populations of 65,000 or more, such as Pasco. Safarli Reply Decl., Ex. 1, ¶¶ 5-6. Additionally, the 2015 1-year estimate is more current than the 2010-2014 5-year estimate, and also accounts for changes in the City's boundaries that have occurred since the 2010-2014 5-year estimate was released. *Id.*

[4] Plaintiff has calculated that the Latino share of the citywide registered voter population is 29.81%. ECF No. 21-2 at 3. This is mostly like because Plaintiff used a registered voter list from November 2015, whereas Defendants relied on the October 2016 list.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 6

The City's and Plaintiff's proposals both provide Latinos with three majority-minority districts.  In Plaintiff's proposal, the next-strongest opportunity for Latinos is District 5, which has a Latino eligible voter population of 28.98% (based on the 2010-2014 5-year ACS estimate).[5] ECF No. 21-2 at 3. In contrast, the Latino share of the citywide eligible voter population is 38.5% (based on the 2015 1-year ACS estimate) or 31.9% (based on the 2010-2014 5-year ACS estimate). Under either estimate, Latinos have a stronger share of the eligible voter population across the entire city than they do in Plaintiff's District 5.

---

[5] Defendants' and Plaintiff's demographers have different methodologies for disaggregating census block group-level data about eligible voters to individual census blocks, which could result in slightly different estimates for the Latino share of the eligible voter population in each single-member district. However, Plaintiff's demographer concedes that the "percentage differences . . . are not significant." ECF No. 28 at ¶8. Still, it is important to note that the methodology used by Defendants' demographer is consistent with demographic best practices as established by the U.S. Census Bureau, whereas Plaintiff's methodology is unsound. *See* Safarli Reply Decl., Exhibit 2 (Second Supplemental Report of Dr. Peter Morrison), ¶¶ 3-4.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 7

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

Plaintiff's District 5 has a Latino registered voter population of 27.25%. Across the entire city, however, Latinos are 31.8%.[6] As with the eligible voter population, the Latino proportion of citywide registered voters is superior to their proportion of registered voters in Plaintiff's District 5. Regardless of how Latino voting strength is measured, the data shows that Latino share of the electorate is larger across the entire city than in Plaintiff's District 5.

-------------------------------

[6] In addition to measuring the Latino share of registered voters using the Spanish-surname method, Defendants' demographer used a second method that accounts for false positives (*i.e.*, those with Spanish surnames who do not self-identity as Hispanic on the decennial census) and false negatives (*i.e.*, individuals who identify as Hispanic but do not have Spanish surnames). The results of this method are contained in Dr. Morrison's First Supplemental Report. Safarli Reply Decl., Ex. 1, ¶9 n.2, Table 2 & Appendix. This method, labeled as "% Hispanic" in Dr. Morrison's report, corroborates the conclusion that Latinos are a majority of the registered voter population in Districts 1, 2, and 6. It also indicates that the true measure of the Latino registered voter population could be substantially higher than the Spanish-surname measurement of 31.8%. *See id.*

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 8

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

# III.    ARGUMENT

## A. Plaintiff Mischaracterizes the Standard for Evaluating Remedial Plans

"Redistricting is a legislative task that federal courts 'should make every effort not to pre-empt.'" *Goosby v. Town Bd. of Hempstead*, 981 F. Supp. 751, 755 (E.D.N.Y. 1997) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539-41 (1978)). "A district court may reject the defendant's proposal under only one condition: if that proposal 'is legally unacceptable because it violates anew constitutional or statutory voting rights – that is, [if] it fails to meet the same standards applicable to an original challenge of a legislative plan in place.'" *Euclid City Sch. Bd.*, 632 F. Supp. 2d at 750 (quoting *McGhee*, 860 F.2d at 115). "That single question ends the Court's inquiry." *Id.*

Aware of this principle of deference, Plaintiff argues that it only applies if the legislative proposal "fully remedies" the Section 2. ECF No. 27 at pg. 3. Defendants agree with Plaintiff that this is the test. The parties diverge, however, on the meaning of a full remedy. Plaintiff asserts that a proposal cannot be a full remedy if it contains any at-large seats. Defendants contend that at-large seats are permissible in legislatively-crafted plans. Both case law and logic support Defendants' position.

In *Citizens for Good Gov't v. City of Quitman*, the Fifth Circuit explained that "'[i]n contrast [to 'court-ordered plans'], reapportionment plans prepared by

FLOYD, PFLUEGER & RINGER P.S.
200 West Thomas Street, Suite 500
Seattle, WA  98119
Tel 206 441-4455
Fax 206 441-8484

1    legislative bodies may employ multimember [or at-large] districts.'" *Id.*, 148 F.3d

2    472, 476 (5th Cir. 1998) (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 139 (1981))

3    (alterations in original). Plaintiff asserts that this is "non-binding dicta." ECF No.

4    27 at pg. 14. But Plaintiff ignores that the Fifth Circuit was quoting from the U.S.

5    Supreme Court, which is decidedly binding.

6        Plaintiff also tries to distinguish *NAACP v. Kershaw County*, in which the

7    Court held that "legislatively-proposed mixed plans are not *per se* violative of

8    Section 2; to the contrary, they are acceptable." *Id.*, 838 F. Supp. 237, 241 (D.S.C.

9    1993). Plaintiff tries to limit *Kershaw County* to its facts because South Carolina

10    required a seat to be elected at-large. *Id.* at 239 n.2. But the Court's pronouncement

11    was clearly not limited to a single state. The Court quoted the Fourth Circuit's

12    holding that "'in fashioning an appropriate remedy, legislatures are not limited to

13    single-member district plans.'" *Id.* at 242 (quoting *Hines v. Ahoskie*, 998 F.2d 1266,

14    1271 (4th Cir. 1993). The Court went on to explain that categorically prohibiting

15    at-large elections "would be in direct contradiction of both the intentions of

16    Congress in enacting the 1982 amendments to the Voting Rights Act and Supreme

17    Court precedent." *Id.* at 243 (citing S. Rep. No. 417, 97th Cong., 2d Sess. 16 (1982);

18    *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986)).

19        Additionally, Plaintiff fails to address *United States v. City of Euclid*, where

20    the Court held that "[m]aintaining the at large election of the City's council

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 10

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

president does not perpetuate the City's Section 2 violation nor does it give rise to a new Voting Rights Act violation." *Id*, 523 F. Supp. 2d 641, 645 (N.D. Ohio 2007).

The categorical prohibition against at-large positions also does not withstand logical scrutiny. According to Plaintiff, the existence of racially-polarized voting[7] necessarily requires that at-large positions be excluded from any proposal. ECF No. 27 at pg. 3 (Defendants' proposal is not a full remedy because the "inclusion of an at-large seat allows racially polarized voting to continue"). But racially-polarized voting is a necessary element of every Section 2 claim. To reach the remedial phase, racially-polarized voting must exist. But if Plaintiff's argument were true, then no suit that reaches remedial phase would ever be able to include at-large positions in the proposal. That cannot be reconciled with case law. *Citizens for Good Gov't*, 148 F.3d at 472; *Kershaw Cnty.*, 838 F.3d at 241; *City of Euclid*, 523 F. Supp. 2d at 645. There is no categorical prohibition on at-large positions in legislatively-

---

[7] Racially-polarized voting is a combination of the second and third factors from *Thornburg v. Gingles*. "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit [*i.e.*, the second *Gingles* factor] and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates [*i.e.*, the third *Gingles* factor]." *Gingles*, 478 U.S. at 56.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 11

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

1  crafted plans, and the existence of racially-polarized voting does not preclude the

2  inclusion of at-large seats in a remedial plan.

3      The legality of the at-large position depends on whether it was included

4  "'solely to diffuse [minority] voting strength.'" *Kershaw Cnty.*, 838 F. Supp. at 242

5  (quoting *Hines*, 998 F.2d at 1271). As detailed in Defendants' previous filings with

6  this Court, the City has included the at-large position for legitimate, policy-based

7  reasons. ECF No. 30 at 7-8. Moreover, the proposition that City included an at-

8  large position to "diffuse" the Latino vote clashes with the City's years-long efforts

9  to voluntarily change its own election system to provide electoral opportunities to

10  Latinos. *See* ECF No. 25 at 5-10 (detailing efforts).

11      Plaintiff also attempts to downplay the significance of proportionality in

12  evaluating a remedial plan. Although an acceptable remedy need not maximize the

13  electoral opportunities of a minority group, the Supreme Court has identified

14  proportionality as a relevant fact when determining "whether members of a

15  minority group have less opportunity than other members of the electorate to

16  participate in the political process and to elect representatives of their choice."

17  *Johnson v. DeGrandy*, 512 U.S. 997, 1000 (1994) (internal quotation marks and

18  citation omitted). An electoral scheme does not violate Section 2 "where, in spite

19  of continuing . . . racial bloc voting, minority voters form effective voting

20  majorities in a number of districts roughly proportional to the minority voters'

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 12

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

1    respective shares in the voting-age population." *Id.* at 1000; *see also City of Euclid*,

2    523 F. Supp. 2d at 645 (explaining the inclusion of an at-large position was

3    acceptable because "the number of opportunity districts in the proposed remedial

4    plan is roughly proportional to the percentage of Euclid's African-American

5    voting-age population. The existence of an at large seat for council president

6    already has been contemplated in this proportion.")

7        Both the City and Plaintiffs' proposals provide Latinos with control over

8    three out of seven positions, which is proportional to the Latino share of the eligible

9    voter population. Moreover, three majority-minority districts is the "the maximum

10   *available* . . . 'to elect representatives of their choice.'"  *Hines*, 998 F.2d at 1273

11   (quoting 42 U.S.C. § 1973, *recodified as* 52 U.S.C. § 10301). The only material

12   difference between the City and Plaintiffs' plans is the next-best electoral

13   opportunity in each plan. In the City's proposal, this is the at-large position. In

14   Plaintiff's proposal, this is District 5. As discussed above and more fully below,

15   the at-large position in the City's plan is a superior electoral opportunity to

16   Plaintiff's District 5. Before reaching that issue, however, Defendants will address

17   the cases cited by Plaintiff.

18

19

20

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 13

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

## B. Courts Do Not Reject Hybrid Plans Simply Because They Are Hybrid

Plaintiff claims that "courts have generally rejected the retention of at-large seats in election systems as incomplete Section 2 remedies." ECF No. 27 at pg. 6. This is an oversimplification and misrepresentation of the law. More specifically, Plaintiff conflates correlation with causation. Although courts have rejected proposals that included at-large positions, the proposals were not rejected *because* they included at-large positions. A careful examination of the cases cited by Plaintiff establishes that hybrid plans are rejected for other reasons. Indeed, several of the cases cited by Plaintiff affirm that at-large seats are permissible in legislatively-proposed plans.

In *LULAC Council No. 4836 v. Midland Indep. Sch. Dist.*, 648 F. Supp. 596, 609 (W.D. Tex. 1986), a seven-member school district proposed two plans. The first had three at-large positions and four single-member district seats ("3-4 plan"); the second had five at-large positions and two single-member district seats ("5-2 plan"). Under the 3-4 plan, only one of the single-member districts was majority-minority. *Id.* at 602. Thus, the 3-4 plan gave minority voters control over only one out of seven seats. In the 5-2 plan, both of the single-member districts were majority-minority, but the Court rejected the plan because it "place[d] the board trustees from the minority districts in a special category . . . because they would be the only two members elected by a single-member district." *Id.* at 608. In this case,

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 14

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

the City's proposal provides Latinos with a proportionate number of opportunities to elect their candidate of choice, and includes single-member districts with both Latino and non-Latino majorities.

In *Williams v. City of Texarkana*, 861 F. Supp. 771 (W. D. Ark. 1993), the Court rejected the city's proposal of six single-member districts and one at-large seat in favor of the plaintiff's seven single-member district plan. The plaintiff's seven single-member district plan included two majority-minority districts, plus a district in which the minority population was 45.8%. *Williams* did not discuss how many majority-minority districts were included in the city's proposal, but a fair reading of the case suggests that the city's proposal provided fewer majority-minority districts than the plaintiff's proposal.

Importantly, the Court noted:

> The Court does not believe it is impossible for a plan featuring an "at large" position to comply with the Voting Rights Act, and *knows of no case which so holds*. In fact, such a plan would provide an opportunity for all citizens, black and white, to have a voice in the selection of the mayor.

*Id.* at 772 (emphasis added). *Williams* is consistent with the cases cited by Defendants that at-large positions are permissible in legislative-crafted proposals.

The next case cited by Plaintiff, *United States v. Dallas Cnty. Comm'n, Dallas Cnty., Ala.*, 850 F.2d 1433 (11th Cir. 1988), is distinguishable both procedurally and substantively. In that case, the Court adopted its own plan—as

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 15

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

opposed to either parties' plan. *Id.* at 1437. Unlike legislatively-drafted plans, judicially-created plans may not include any at-large positions. *Citizens for Good Gov't v. City of Quitman*, 148 F.3d 472, 476 (5th Cir. 1998). By including an at-large seat, the Court's plan conflicted with the *per se* prohibition against at-large positions in judicially-created plans. *Chapman v. Meier*, 420 U.S. 1, 27 (1975). Given this, the fact that the Eleventh Circuit reversed the district court is not surprising. Additionally, the Court's plan contained four single-member districts and one at-large seat. Only one of the single-member districts was majority-minority. *Id.* at 1438. Thus, the Court's plan gave African-Americans control over only one out of five (or 20% of seats). African-Americans, in contrast, constituted nearly half of the eligible voter and registered voter populations. *Id.* at 1434-35.

The hybrid plan in *Dallas County* was rejected because it violated the prohibition on at-large positions in judicially-crafted plan, and because it did not give African-Americans a proportionate number of seats. In this case, the City's plan provides a proportionate number of election opportunities. And because the City's plan is a legislative proposal, the inclusion of an at-large position is permissible. Indeed, the Eleventh Circuit in *Dallas County* affirmed this rule: "'The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se.'" *Id.* at 1438 (quoting *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 250 (11th Cir. 1987)).

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 16

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

1    *United States v. Osceola Cnty*, 474 F. Supp. 2d 1254 (M.D. Fla. 2006) and

2    *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038 (8th Cir. 1997) both involve

3    legislative hybrid plans that provided minority voters with fewer election

4    opportunities than their share of the electorate would dictate. *Osceola Cnty.*, 474 F.

5    Supp. 2d at 1256 (county's hybrid proposal would have given Latinos control of

6    only 14% of seats, while the government's proposal gave Latinos a reasonable

7    opportunity to elect 20% of board members; Latino share of the voting-age

8    population was approximately 27.14%)[8]; *Harvell*, 126 F.3d 1038 (legislatively-

9    proposed plan gave African-American voters control over only 28.5% of seats in

10   favor of competing plan that gave control over 37.5% of seats; African-Americans

11   were 31.04% of eligible voter population). As with the other cases cited by

12   Plaintiff, neither *Osceola County* nor *Blytheville School District* endorsed a *per se*

13   prohibition against at-large positions in legislatively-created proposals.

14       Plaintiff cites *Montes v. City of Yakima*, but that decision also does not

15   preclude at-large positions in legislatively-proposed plans.  In *Montes*, the city's

16   proposal "d[id] not provide a present opportunity for Latinos to obtain roughly

17   proportional representation." No. 12-cv-03108 (E.D. Wash.), ECF No. 143 at 24.

18   The Court was also concerned that the city's proposal violated state law by not

19

20   ───────────────
     [8] *United States v. Osceola Cnty.*, 475 F. Supp. 2d 1220, 1223 (M.D. Fl. 2006).

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 17

FLOYD, PFLUEGER & RINGER P.S.
200 West Thomas Street, Suite 500
Seattle, WA  98119
Tel 206 441-4455
Fax 206 441-8484

1   including a primary election for the two at-large positions. *Id.* at 17-18. The fact

2   that the city's rejected proposal in *Montes* contained at-large seats does not mean

3   that the proposal was rejected *because* it contained at-large seats. A careful

4   examination of *Montes* and the other cases cited by Plaintiff shows that the hybrid

5   plans were rejected for other reasons (*e.g.*, lack of proportional representation) that

6   are not present in the City's proposal. In short, none of the cases cited by Plaintiff

7   are analogous.

8   **C.  The City's Proposal is a Full and Complete Remedy**

9       As established above, there is no categorical prohibition on at-large positions

10  in legislatively-crafted plans, and the existence of racially-polarized voting does

11  not preclude the inclusion of at-large positions in a remedial plan. Instead, the

12  inquiry is whether (1) the at-large position was included solely to diffuse minority

13  voting strength, *Kershaw Cnty.*, 838 F. Supp. at 242; and (2) whether the City's

14  proposal provides Latinos with electoral opportunities in proportion to their share

15  of the eligible voter population. *Johnson*, 512 U.S. at 1000.

16      The answer to the first question is a resounding "no," as demonstrated by the

17  self-evident benefits of citywide representation and the City's history of attempting

18  to voluntarily change its election system for the benefit of Latino voters. *See* ECF

19  No. 25 at 5-10. The answer to the second question is "yes," as the City's plan

20  provides Latinos with control over three out of seven seats, which is the maximum

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 18

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

number available and is proportional to the Latino eligible voter share. This is also the same number of seats that Plaintiff's proposal provides to Latinos.

Aside from the three majority-minority districts, the next-strongest election opportunity in Plaintiff's plan is District 5, which has an eligible voter population that is 28.98% Latino. ECF No. 21-2 at 3. In contrast, the Latino share of citywide eligible voter population is 31.9% according to the 2010-2014 5-year ACS, and 38.5% according to the 2015 1-year ACS estimate—nearly *10 percentage points higher* than Latino share of Plaintiff's District 5's eligible voter population. Additionally, Plaintiff's District 5 has a registered voter population that is 27.25% Latino. But Latinos comprise 31.8% of the citywide registered voter population. Under both the eligible voter and registered voter population measurements, Latinos have a superior opportunity to elect their candidate of choice in an at-large election than in Plaintiff's District 5.

Plaintiff argues that the existence of racially-polarized voting puts the at-large position "out of reach of the Latino community" because the white majority will consistently vote as a bloc to cancel out Latino voters. ECF No. 27 at pg. 1. But this contention ironically applies with greater force to Plaintiff's District 5. Because Latinos are a smaller share of the electorate in Plaintiff's District 5 than they are citywide, Latinos are *less* able to elect their candidate of choice in Plaintiff's District 5.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 19

FLOYD, PFLUEGER & RINGER P.S.
200 West Thomas Street, Suite 500
Seattle, WA  98119
Tel 206 441-4455
Fax 206 441-8484

1    Moreover, demographic data undeniably shows that the City's Latino

2    electorate is increasing rapidly. Student enrollment data from the Pasco School

3    District is a stark example. Nearly 71% of students are Latino. ECF No. 26-13 at

4    ¶4. Plaintiff's demographer, William Cooper, disputes the relevance of this

5    statistic, but his criticisms ring hollow. Mr. Cooper claims that this statistic should

6    be ignored because the Pasco School District encompasses a geographical area that

7    includes—but is much larger than—the City. ECF No. 28 at ¶¶4-7. Mr. Cooper

8    ignores the fact that most of the excess geographical area is empty acreage. 68,155

9    people reside within the school district's boundaries. The City's total population

10   (62,452) accounts for 92% of the school district's population. Safarli Reply Decl.,

11   Ex. 2 at ¶¶1-2. Although the boundaries of the Pasco School District are not

12   coextensive with the City's boundaries, there is substantial population overlap. The

13   fact that 71% of the school district's students are Latino is informative to projecting

14   the City's population growth.

15   Although Mr. Cooper cannot bring himself to acknowledge the relevance of

16   the Pasco School District's demographic profile, he still recognizes that Latinos

17   make up an enormous part of the City's youth population. Instead of relying on the

18   school district's statistics, Mr. Cooper examines only the number of Latinos under

19   18 who reside in the City. He cites the 2010 Decennial Census, which shows that

20   66.47% of the City's youth are Latino. ECF No. 28 at ¶7. Critically, he also cites

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 20

FLOYD, PFLUEGER & RINGER P.S.
200 West Thomas Street, Suite 500
Seattle, WA  98119
Tel 206 441-4455
Fax 206 441-8484

the 2010-2014 5-year ACS and 2015 1-year ACS, which show that Latinos are 64.86% and 66.6%, respectively, of the City's under-18 citizen population. *Id.* This supports the conclusion of Defendants' demographer that Latinos will comprise more than 40% of the eligible voter population by 2021.[9]

Because the data shows that Plaintiff's District 5 is an inferior election opportunity compared to the at-large position in the City's proposal, Plaintiff resorts to asserting that campaigning in a citywide election is more costly. Notably, Plaintiff has not presented any evidence to support this assertion. Plaintiff's argument is entirely speculative and does not consider whether "campaign costs could actually be higher in a single-member district, if a highly competitive campaign developed." *Wilson v. Vahue*, 403 F. Supp. 58, 63 (N.D. Tx. 1975).

Next, Plaintiff attempts to attack the inclusion of an at-large seat by arguing that it is a "swing seat" that will remain under control of non-Latino voters until Latinos become a majority of the electorate. Plaintiff tries to analogize this to *Harper v. City of Chicago Heights*, 223 F.3d 593 (7th Cir. 2000), but that case is inapposite. In *Harper*, the Court considered a proposal with six alderman elected

---

[9] Dr. Morrison's methodology for his projection is contained in his Second Supplemental Report. Safarli Reply Decl., Ex. 2, ¶¶5-9 & Table 1.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 21

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

by single-member districts and a mayor elected at-large. Three of the six single-member districts were majority-minority.

The mayor had special powers, in that he or she was "was authorized to appoint a city clerk and treasurer . . . as well as administrative assistants and a budget and finance director." *Id.* at 597. The mayor could also "exercise veto power, which can be overridden only by a 3/5 majority of the council (i.e. four of the six aldermen)." *Id.* at 598. Finally, the plaintiffs submitted evidence that the mayor frequently served as a tiebreaker by voting with "the white aldermen." *Id.* While noting that "at-large procedures are not unconstitutional per se," the Court determined that "[t]he evidence of the mayor's pattern of voting in tie-breaking situations, taken with the likelihood of ties on an even-numbered council" was sufficient to invalidate the hybrid plan. *Id.* at 600.

In *Harper*, the plaintiffs supported their position by submitting evidence of voting behavior by the aldermen and the mayor. Here, Plaintiff tries to avail herself of *Harper* but fails to offer any facts to support her application of that case.[10]

---

[10] Although Plaintiff tries to minimize it, *see* ECF No. 27 at 13, the Court's decision in *Harper* was also based on the special authority given to the mayor. In the City's proposal, the at-large position does not have any special designation. The City's mayor is not chosen by voters, but by the City Council itself. RCW

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 22

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

1    Indeed, Plaintiff's argument is based on flawed reasoning: Plaintiff asserts that

2    Latinos and non-Latinos vote for different candidates and, therefore, those

3    candidates will necessarily vote differently on the issues once in office. While

4    voters may vote differently because of their ethnicity, Plaintiff has not shown that

5    *elected officials* vote differently because of their ethnicity. To assume that without

6    evidence would be extremely reductive.

7    Furthermore, Plaintiff's argument applies equally to her own proposal. In

8    Plaintiff's plan, Latinos will have control over three single-member districts (the

9    same number as in the City's plan). But under Plaintiff's proposal, four single-

10    member districts are firmly in the hands of non-Latino voters. Plaintiff apparently

11    believes her District 5 is a "swing" district but, as established above, Latinos have

12    better numbers citywide than they do in Plaintiff's District 5. Plaintiff cannot

13    complain about the City's at-large position "swinging" toward non-Latino voters

14    when Plaintiff's District 5 leans even more heavily toward non-Latino voters.

15

16

17

_____

18    35A.13.030. The position of mayor, moreover, is primarily ceremonial, with no

19    additional powers nor any regulatory duties. *See id.* Critically, the City's mayor

20    has no veto power as it did in *Harper*.

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 23

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484

## IV.  <u>CONCLUSION</u>

The City's proposal is constitutional, fully cures the Section 2 violation established in the Consent Decree, and provides Latinos with a full and fair opportunity to participate in the political process.  Plaintiff's *sole* objection to the City's plan is that it contains one at-large seat. But it is black-letter law that legislatively adopted plan may utilize at-large districts. Because Defendants' plan provides a complete remedy to the Section 2 violation, is must be given deference by this Court and adopted.


RESPECTFULLY SUBMITTED this 15th day of November, 2016.

s/ Leland B. Kerr
Leland B. Kerr, WSBA No. 6059
lkerr@kerrlawgroup.net
KERR LAW GROUP
7025 W. Grandridge Blvd., Ste. A
Kennewick, WA 99336
(509) 735-1542


s/ John A. Safarli
John A. Safarli, WSBA No. 44056
jsafarli@floyd-ringer.com
FLOYD, PFLUEGER & RINGER, P.S.
200 W. Thomas Street, Ste. 500
Seattle, WA 98119
(206) 441-4455

Attorneys for Defendants

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION - 24

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of November, 2016, I electronically filed the foregoing Notice of Association of Counsel with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Emily Chiang                          echiang@aclu-wa.org, ewixler@aclu-wa.org

La Rond Baker                         lbaker@aclu-wa.org, ewixler@aclu-wa.org

Breanne Schuster                      bschuster@aclu-wa.org,
                                      breanne.schuster@gmail.com

Brendan V. Monahan                    bvm@stokeslaw.com,
                                      debbie.wilson@stokeslaw.com,
                                      lori.busby@stokeslaw.com,
                                      stephanie.salinas@stokeslaw.com

Leland B. Kerr                        lkerr@kerrlawgroup.net,
                                      kdebevec@kerrlawgroup.net

Cristin J Aragon                      caragon@yarmuth.com

Gregory P Landis                      glandis@yarmuth.com, vskoulis@yarmuth.com


By:     s/ John Safarli
        John Safarli, WSBA #44056
        Floyd, Pflueger & Ringer, P.S.
        200 West Thomas St Ste. 500
        Seattle, Washington 98119-4296
        Telephone:  (206) 441-4455
        Facsimile:   (206) 441-8484
        jsafarli@floyd-ringer.com

REPLY IN SUPPORT OF
DEFENDANTS' PROPOSED
REMEDIAL PLAN AND FINAL
INJUNCTION

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA  98119
TEL 206 441-4455
FAX 206 441-8484