UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

BERTHA ARANDA GLATT,

      Plaintiff,

   v.

CITY OF PASCO, *et al.*,

      Defendants.

Case No.  4:16-CV-05108-LRS

MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

On August 4, 2016, Plaintiff, Brenda Glatt, filed a Complaint against the City of Pasco and its City Council members in their official capacities alleging that the City's "at large election method of electing Pasco City Council members violates Section 2 of the Voting Rights Act… 52 U.S.C. § 10301." (ECF No. 1 at 9).  Section 2 of the Voting Rights Act (VRA) prohibits the imposition of a "voting qualification or prerequisite to voting or standard, practice, or procedure...which results in a denial or abridgement of the right of any citizen...to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of § 2 is established if, "based on the totality of circumstances," the challenged electoral process is "not equally open to participation by members of a [racial minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to

ORDER- 1

elect representatives of their choice." 52 U.S.C. § 10301(b). The essence of a § 2 claim, as set forth in seminal case *Thornburg v. Gingles*, 478 U.S. 30 (1986), is "that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." 478 U.S. at 47.

On September 2, 2016, the court approved entry of the parties' Partial Consent Decree wherein Pasco admitted liability and consented to the court's finding that the City's existing at-large method of electing all its members to the Pasco City Council violated § 2 of the VRA by diluting the electoral power of Pasco's Latino voters. (ECF No. 16 at 10).   The Partial Consent Decree fully resolves the issue of liability. The court enjoined the Defendants from conducting future elections under that system "or any other election method that violates Section 2 of the Voting Rights Act." (ECF No. 16 at 12).  The Partial Consent Decree did not mandate a particular remedy.

Now pending are the parties' proposed remedial plans (filed as cross-motions at ECF Nos. 21, 25) after they failed to reach agreement on this aspect of the case.  On December 7, 2016, the court held oral argument.  Present on behalf of Plaintiff were Brendan Monahan, Emily Chiang, La Rond Baker, Gregory Landis, and Cristin Aragon.  Present on behalf of Defendants, City of Pasco were John Safarli, Leland Kerr, and Casey Bruner.

ORDER- 2

The parties' motions are supported by declarations, reports, and data of highly experienced demographic and redistricting experts: Richard L. Engstrom, Ph.D. (ECF Nos. 23, 29); William S. Cooper (ECF Nos. 24, 28, 32); and Peter A. Morrison, Ph.D. (ECF No. 26, Ex. 13; ECF Nos. 33, Exs. 1 and 2).

There are three electoral formats commonly used by municipal governments in the United States: at-large systems, single-member district systems, and "mixed" or "hybrid" systems. *See Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 981 F.Supp. 751, 757 (E.D.N.Y. 1997). "In an at-large system, all members of the legislative body are elected from a district that includes all members of the electorate. In a single-member district system, the legislators are elected from compact, contiguous and essentially equipopulous districts. In a mixed system, some members of the legislature are elected from single-member districts, while other members, usually a smaller number, are elected at large. In a typical mixed system, the districts cover the entire municipality. Thus, each voter is represented both by one or more legislators elected from a district and one or more legislators elected at large." *Id.*

In this case, the Pasco City Council has adopted a "mixed" or "hybrid" 6-1 remedial plan redrawing its voting districts and utilizing a scheme in which six members are elected from districts and a single position is elected at-large. The primary issue is whether the remedial plan is legally acceptable. If it is, the parties agree deference is owed to the Pasco City Council's legislative judgment. If it is

ORDER- 3

not, Pasco concedes the court has authority to judicially impose Plaintiff's proposal with seven single-member geographic residency districts.   This Memorandum Opinion and Order approves the City's remedial plan, directs its implementation, and denies the Plaintiff's request for permanent injunction, but retains jurisdiction.

## II.    BACKGROUND

As with all cases under the Voting Rights Act, this one is driven by the facts.  The City of Pasco has conceded that its current City Council election scheme violates § 2.   The key factual conclusions supporting the court's finding of liability are contained in the Partial Consent Decree.  (ECF No. 16). Because of their length, the stipulated facts and findings in the Partial Consent Decree are incorporated by reference.

The parties have decided that the public interest is best served by efforts to settle this litigation thus avoiding "protracted, costly, and potentially divisive litigation." (ECF No. 16 at ¶ 23).   The experience of courts applying the Voting Rights Act confirms that it is one the most difficult and intricate responsibilities a district court will confront.  *See e.g., Patino v. City of Pasadena*, 2017 WL 68467 (S.D.Tex. Jan. 6, 2017) (after rulings on motions to dismiss and for summary judgment, district court held a 7-day trial involving 16 witnesses and 468 exhibits resulting in a 111-page decision).  The parties' experts largely rely on the same sources of data, with the exception that the Defendants' expert, Mr. Morrison, has also supplied analysis

ORDER- 4

based upon recently obtained data from the Franklin County Auditor's Office.[1] (ECF No. 33, Ex. 1). The experts' methodologies differ and variances in their data exists, however these differences are not material to the court's decision.  No party has requested a trial or evidentiary hearing on the facts.

**A. Pasco's Demographics**

**1.  Latino Population**

The City of Pasco, is located in south central Washington and is one of three cities that make up the Tri-Cities region.  Its geography encompasses approximately 38.7 square miles. (ECF No. 28 at 2). Pasco's population nearly doubled between 2000 and 2010.  (ECF No. 24 at 4). Its adjusted population based on the 2010 decennial U.S. Census is 62,452.  *Id.*  More recent population estimates of the Washington Office of Financial Management indicate the population is 70,560. (ECF No. 24 at 6). According to the 2010 Census, the City is 54.02%[2] Latino and

---

[1] Plaintiff objects to this data on the sole basis that it was submitted for the first time along with Defendants' Reply.  (ECF No. 34).  The court declines to strike the data or that portion of the Reply relying upon this new information absent evidence of prejudice.

[2] Defendants' expert indicates more recent estimations of the Latino share of the total population include 45.02% (based upon the 5-year 2010-2014 American

ORDER- 5

40.44% non-Hispanic White. (ECF No. 24 at 5). The 2010 Census data adjusted for annexations estimates that Pasco has a population under age 18 that is 66.47% Latino and 25.48% non-Hispanic White. (ECF No. 24 at 5).

Mr. Morrison estimates Pasco's Spanish-surnamed voter registration is 31.8% as of October 2016. (ECF No. 33, Ex 1 at 3, ¶9; Ex. 2 at 4-5). This statistic is an estimate of Latino registered voters in Pasco.

**2. Citywide Latino Citizen Voting-Age Population**

The American Community Survey ("ACS"), produced by the U.S. Census Bureau, provides two estimates of the Latino citizen voting-age population ("LCVAP") (residents that are legally able to vote) in Pasco. The first is based upon a five-year survey for 2010-2015 and the second is based on the one-year survey for 2015. The one-year estimate accounts for Pasco's city limits as of 2015. (ECF No. 33, Ex. 1 at 2). The estimates for LCVAP are 31.9% of the citywide eligible voter population (5-year estimate), 32.09% (5-year estimate adjusted), and 38.5% (2015 1-year estimate). The 2015 estimate is most current and includes recent annexations, however, the five-year estimate (which does not take into account the 2014 and 2015 annexations) is more statistically reliable.

_____

Community Survey estimate) and 49.7% (the 2015 1-year American Community Survey estimate). (ECF No. 24 at 7, ¶¶21-22).

ORDER- 6

Given that a significant portion of the City's population is Latino and young, trends show and experts forecast the LCVAP to increase in the coming years. (ECF No. 33, Ex. at 2). Mr. Morrison predicts the LCVAP is likely to exceed 40% by 2021. *Id.*

**B. Pasco's 5-2 Method of Electing its City Council**

Pasco is a non-charter code city with a council-manager form of government. (ECF No. 25 at 3). The Mayor and Mayor Pro Tempore are chosen by councilmembers. (ECF No. 25 at 5). While the Mayor presides over Council meetings, the role is "for ceremonial purposes." *Id.* (quoting Wash.Rev.Code § 35A.13.030).

The Pasco City Council consists of seven members. When the last City Council election was held, the City was utilizing an at-large, numbered "place system" for electing councilmembers to serve staggered four-year terms. (ECF No. 31 at 10). Five of the seven positions (identified as Positions 1 through 5) were tied to geographical residency districts. Candidates for Positions 1 through 5 were required to reside in their respective geographical residency districts. In the August primary, voters narrowed the field of candidates for the district in which they resided. The top two candidates in each district proceeded in the general election, which was conducted at-large and the candidate receiving a majority of votes won. Positions 6 and 7 were both at-large positions, in that voters citywide narrowed the field of

candidates for each seat in the primary and then voted for one of two candidates for each position in the general election.  Washington state law requires that "all voters of a code city be permitted to vote in each city council race at the general election." Wash. AGO 2016 NO. 1 (Wash.A.G.), 2016 WL 439289 (Jan. 28, 2016)(discussing Wash.Rev.Code §35A.12.180).[3]  The key features of Pasco's election scheme were the combination of: 1) a numbered place system; 2) a top two primary system; and 3) at-large general elections for every seat with a majority vote rule. *See* ECF No. 23 at ¶ 10.

In 2015, Plaintiff Brenda Glatt, a Latina, was a candidate for Pasco City Council at-large Position 6.  In the general election, she was defeated decisively by non-Latino candidate Matt Watkins despite her strong support from Latino voters.  (ECF

---

[3] The statute provides that voters of the "entire city may vote at the general election to elect a councilmember" of a district, "unless the city had prior to January 1, 1994, limited the voting in the general election" to voters residing in the district. Wash.Rev.Code §35A.12.180. The role the Supremacy Clause of Article VI of the U.S. Constitution plays herein is acknowledged by the parties and this court.  *See Cleveland Cnty. Ass'n for Gov't by the People v. Cleveland Cnty. Bd. of Comm'rs,* 142 F.3d 468, 477 (D.C.Cir.1998) (per curiam) ("[I]f a violation of federal law necessitates a remedy barred by state law, the state law must give way; if no such violation exists, principles of federalism dictate that state law governs.").

ORDER- 8

No. 23 at ¶ 20).

The next municipal election will be in November 2017, at which time four (4) of the seats on the Pasco City Council are presently up for election.

**C. Pasco's Efforts Toward Election Change**

Four years ago a Voting Rights Act case was filed against the city of Yakima, Washington, a town of 91,000, just 80 miles from Pasco.  As in this case, the complaint contended the city's at-large electoral system of electing city councilmembers violated § 2.  In August 2014, judgment was entered in favor of Plaintiffs. *Montes v. City of Yakima*, 40 F.Supp.3d 1377 (E.D.Wash., Aug. 22, 2014).

The record evidences that since 2014, Pasco has been responsive to the concern that its election system had a disproportionate impact on the Latino vote. In 2014, Pasco hired a demographer. In March 2015, the City Council modified its district boundaries to provide 2 majority-minority districts "with the goal of providing for equal voting opportunity for all citizens" (ECF No. 26, Ex. 2 at 1).  In May 2015, the City Council enacted Resolution No. 3635 declaring its intent to pursue a district-based election system and further declaring its continuing intent to provide equal voting opportunities for all its citizens, and to provide equitable and proportional representation.  (ECF No. 16 at ¶ 6)(ECF No. 26, Exs. 4-5). However, state law mandating at-large general elections put the City in the proverbial position between a rock and a hard spot.  This position was confirmed in the State Attorney General's

Office response to the City's query about the legality of modifying the at-large election scheme to avoid a violation of § 2.  (ECF No. 26, Ex. 10); Wash. AGO 2016 NO. 1 (Wash.A.G.), 2016 WL 439289 (Jan. 28, 2016) ("code cities in Washington…face difficult decisions and potential legal risk regardless of what course they choose…Either course of action, whether to adhere to state law or to depart from it, may be subject to challenge in court.").  Pasco continued to seek change by helping draft legislation (Senate Bill 6129) which would have allowed Pasco to avoid the restrictions of Wash.Rev.Code §35A.12.180.  (ECF No. 25 at 9) The mayor testified before the state senate in favor of the bill, but the bill did not pass. *Id*. at 9-10.

Months prior to filing this lawsuit, the American Civil Liberties Union (ACLU) of Washington notified Pasco that it believed its election system violated federal law. Pasco began consulting with the ACLU.   The City felt the lawsuit was necessary "as the only available means to bring the force of federal law to remedy the problem that exists as a result of state law."  (ECF No. 26, Ex. 10 at 2).

As stated in the Partial Consent Decree, "there is no evidence of any discriminatory motive or intent by the non-Latino population in exercising their own rights to vote."  (ECF No. 16 at 8, ¶ 20).  There is no evidence in the record of a history of official discrimination against Latinos.

**D. Partial Consent Decree Stipulations**

ORDER- 10

The Partial Consent Decree includes key concessions establishing the three *Gingles* preconditions for a violation of § 2, which are: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority group is politically cohesive, and (3) the majority group votes sufficiently as a bloc[4] to enable it, in the absence of special circumstances, "usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). Specifically, the Partial Consent Decree states:

> (12)…Pasco's large Latino population is sufficiently numerous and compact to form a majority in at least one single-member district, is political[ly] cohesive, and the non-Latino majority votes sufficiently as a block to defeat a Latino preferred candidate.
> ….
> (17) The majority of voters in Pasco are white and have historically engaged in bloc voting favoring non-Latino candidates….
> (18) There is a pattern of racially polarized voting in the City of Pasco City Council elections. The voting patterns and the presently mandated at-large general election of all City Council candidates make it very difficult for the Latino community to elect candidates of their choice. Although other minority candidates have been elected to the City Council, as a result of racially polarized bloc voting, no Latino candidate has ever won an opposed election to the Pasco City Council. The first Latina to serve on the City Council was Luisa Torres. She was appointed to the Council in 1989. Luisa ran for election in 1989 but was defeated by a non-Latina candidate. The only other Latino to serve on the City Council was also first appointed to the City Council, Saul Martinez. He subsequently ran unopposed, which enabled him to retain his seat.
> (19) In 2015, six Latinos ran for two positions on [the] City Council. Despite strong support of Latino voters, the two Latinas who survived the primary

---

[4] Racially polarized voting means "a consistent relationship between [the] race of the voter and the way in which the voter votes." *Gingles*, 478 U.S. at 53 n. 21 (internal citations and quotations omitted).

ORDER- 11

election were both defeated in the November 2015 general election.

(ECF No. 16 at 5-8).

In conceding liability, Pasco also concedes there is "sufficient evidence" to conclude that "based on the totality of circumstances," the challenged electoral process impermissibly impairs the minority group's ability to elect representatives of its choice. *Gingles*, 478 U.S. at 44–45; *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (adopting the *Gingles* two-step analysis).  Specifically, the Partial Consent Decree states as follows:

> (22)…[T]here is sufficient evidence of disparities to show inequality in opportunities between the white and Latino populations and that the existing at-large election system for the Pasco City Council has excluded Latinos from meaningfully participating in the political process and diluted their vote such that Latinos are unable to elect candidates of their choice to the City Council…In order to remedy the City of Pasco's Section 2 violation, the City must adopt a new election system.

 (ECF No. 16 at 8).

**E. Council Approval of 6-1 Hybrid Single-Member/At-Large Plan**

After entry of the Partial Consent Decree, the City Council held public hearings to evaluate three alternative systems for future elections including alternatives with two, one, and no at-large positions.  (ECF No. 26, Ex. 10).  On September 19, 2016, the Council voted in favor of an election system comprised of six districts and one at–large seat. (ECF No. 21)  On October 10, 2016, the Council approved Ordinance No. 4315 creating the "6-1" redistricting plan.  (ECF No. 26,

Ex. 10). Under this plan, six of the councilmembers would be elected by the voters in each of the City's six "single-member districts" ("SMD"); a seventh seat would be elected at-large.  The geographic residency districts divide the entire territory within Pasco city limits into six instead of five geographic districts. Three districts (Districts 1, 2 and 6) are majority-minority districts in which Latinos constitute more than 50% of that district's eligible and registered voters.  (ECF No. 26, Ex. 13 at 2; ECF No. 33 at 5; ECF No. 33, Ex. 1 at 4).  The new district boundaries align with 58 out of 67 existing precincts. (ECF No. 33, Ex. 2 at 4).  The City's map and "Table 1" of demographic data (based upon the 2010-2014 5-year ACS estimates) are reproduced in Appendix A attached to this decision.

The Latino share of eligible voters based upon figures from the 2010-2014 5-year ACS estimate for Position 1 was 54.0%; Position 2, 52.3%; Position 3, 27.3%; Position 4, 23.6%; Position 5, 13.0%; and Position 6, 56.0%.  (ECF No. 26, Ex. 13 at 5). The parties agree that the City's plan provides three majority-minority "opportunity" districts (Positions 1, 2, and 6), and at least one district in which Latinos are not a majority but have a Latino voting age population exceeding 25%.

The court notes that Plaintiff has not had the opportunity to respond or offer their own expert analysis of Mr. Morrison's statistical analysis of current registered voters by District contained in "Table 2" at ECF No. 33, Ex. 1, based upon 2016 data from the Franklin County Auditor's Office. (ECF No. 33, Ex. 1)(Morrison First

ORDER- 13

Supplemental Report). Mr. Morrison estimates the Latino share of registered voters district-wide are: Position 1 (58.5%); Position 2 (61.6%); Position 3 (41.4%); Position 4 (40.9%); Position 5 (38.2%); Position 6 (61.7%). *Id*.

The City Council's Ordinance states that this alternative was preferred over other proposals due to: 1) "its providing three Latino citizen-voter-age majority districts, the same number as possible under the ACLU's preferred seven district plan;" 2) "the plan providing greater opportunities for voters to influence the number of elections for members of the City Council and for voters to have the opportunity to run for seats on the City Council"; and 3) "the possibility of greater continuity of government and ease in implementation." (ECF No. 26, Ex. 10 at 2). There is no evidence that the adoption of this plan was motivated by racial animus.

## F. Plaintiff's Proposed 7-0 Plan

Plaintiff opposes the plan passed by Pasco and proposes an alternative dividing the City into seven single-member residency districts and no at-large position. The Plaintiff's map and table of demographic data is reproduced in Appendix B attached to this Order. Like the City's plan, Plaintiff's plan also provides three majority-minority districts and one district, in which the LCVAP exceeds 25%, which Plaintiff characterizes as an "influence district."

## III. LEGAL STANDARDS

The vote is one of the most critical features of a representative democracy and

therefore one of our most fundamental rights. *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (describing the right to exercise the franchise in a free and unimpaired manner as "preservative of other basic civil and political rights").  Although great progress has been made, "voting discrimination still exists; no one doubts that," and § 2 of the Voting Rights Act remains a crucial "permanent, nationwide ban," *Shelby Cnty. v. Holder*, 133 S.Ct. 2612, 2619 (2013), on "even the most subtle forms of discrimination," *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting). Federal courts have a vital role in protecting the right "to participate equally in the political process." *Gingles*, 478 U.S. at 80.  Though vital, this role is limited. The following key principles guide the court's analysis and decision.

### A. General Remedial Powers under the VRA and the Complete and Full Remedy Standard

Where, as here, a violation of § 2 has been established, "courts should make an affirmative effort to fashion an appropriate remedy for that violation." *Monroe v. City of Woodville, Mississippi*, 819 F.2d 507, 511 n. 2 (5th Cir.1987) (per curiam), *cert. denied*, 484 U.S. 1042 (1988); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006)(the district court's "first and foremost obligation...is to correct the Section 2 violation."). The legislative history of the VRA states:

> The basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated provides adequate assurance, without disturbing the prior case law or prescribing in the statute mechanistic rules for formulating remedies in cases which necessarily depend upon widely varied proof and local circumstances. The court should exercise its traditional equitable

powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

S.Rep. No. 417 at 31, 97th Cong., 2d Sess. 44, reprinted in 1982 U.S.Code Cong. & Admin.News at 208 (footnote omitted). In sum, "'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir.1984) (*quoting Louisiana v. United States*, 380 U.S. 145, 154 (1965)), *cert. denied sub nom. City Council v. Ketchum*, 471 U.S. 1135 (1985); *see also, Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir.1987)(A court "cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation.").

A complete § 2 remedy does not mean that a remedial plan must guarantee electoral success for Latinos.   The plan must provide "a genuine opportunity 'to exercise an electoral power that is commensurate with its population.'" *U.S. v. Village of Port Chester*, 704 F.Supp.2d 411, 449 (S.D.N.Y. 2010) (*quoting LULAC v. Perry*, 548 U.S. 399, 428 (2006)); *see also Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); *Bone Shirt*, 461 F.3d at 1023 ("The defendants' argument that the remedial plan must provide some sort of guarantee that Indian–preferred candidates will be elected is

not persuasive; all that is required is that the remedy afford Native-Americans a realistic opportunity to elect representatives of their choice.").

Any proposal to remedy a § 2 violation must itself conform to § 2. *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988), *cert. denied*, 490 U.S. 1030 (1990). A remedy "should be sufficiently tailored to the circumstances giving rise to the § 2 violation." *Id.*

A remedy for a § 2 violation must not itself be enacted with the discriminatory intent of diluting the Latino vote. *Dillard v. Crenshaw Cnty., Ala.*, 831 F.2d 246, 249 (11th Cir. 1987); *Edge v. Sumter Cnty. School Dist.*, 775 F.2d 1509, 1510 (11th Cir. 1985).   There is no evidence the at-large election scheme here was conceived as a tool of racial discrimination.[5]  *C.f., Patino v. City of Pasadena*, 2017 WL 68467 (S.D.Tex., January 6, 2017).

**B. Judicial Deference**

Where the Pasco City Council has exercised its political and policy judgment in preparing and passing the Ordinance behind Defendants' remedial scheme, the proposal is properly characterized as a "legislative" plan. *See e.g., Wise v. Lipscomb*,

---

[5]  Although proof of discriminatory intent is not dispositive, when it exists, it is not irrelevant in assessing the totality of the circumstances.  Plaintiff's contention that intent is "irrelevant" here acknowledges that there is no "concrete evidence" of discriminatory intent at play in this case. (ECF No. 31 at 10).

ORDER- 17

437 U.S. 535, 538 (1978) (upholding system as a valid legislatively enacted plan, despite the absence of an express grant of legislative power to the City Council to change the election system); *Jenkins v. City of Pensacola*, 638 F.2d 1249, 1252 (5th Cir. 1981)(conceding that on balance, the plan was "better viewed as a legislative plan" rather than court-ordered, where the plan, which called for seven single-member districts and three at-large districts, was formally adopted by ordinance after liability was established and the court directed the parties to submit proposals). Plaintiff makes no argument to the contrary.

Federal courts are reluctant to interfere with legislative decisions of governing bodies especially when they concern issues as sensitive as those regarding who votes, how they vote, and what districts they vote in.  The Supreme Court has cautioned that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (plurality) (White, J.); *see also, Connor v. Finch*, 431 U.S. 407, 414–15 (1977); *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *White v. Weiser*, 412 U.S. 783, 794–95 (1973); *Upham v. Seamon*, 456 U.S. 37, 39 (1982).

The role of the court in fashioning a remedy for a violation of the Constitution was delineated by the Supreme Court is *Wise v. Lipscomb,* where the court said "it is ... appropriate, whenever practicable, to afford a reasonable opportunity for the

legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise*, 437 U.S. at 540; *see also United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) ("[A]t least in redistricting cases, district courts must offer governing bodies the first pass at devising a remedy.").  This court's role is similar in fashioning a remedy for a violation of the Voting Rights Act.  Where a legislative body proposes a plan which completely remedies the § 2 violation and is not unconstitutional or otherwise illegal, then that plan "will ... be the governing law," even if it is not the plan the court would have chosen. *Wise*, 437 U.S. at 540; *see also, Upham v. Seamon*, 456 U.S. 37, 39 (1982)("a court must defer to legislative judgments on reapportionment as much as possible"); *Perry v. Perez*, 132 S.Ct. 934, 941 (2012)(the legislative plan "serves as a starting point for the district court.");  *Williams v. City of Texarkana, Ark*., 32 F.3d 1265, 1268 (8th Cir. 1994)("If an appropriate legislative body offers a remedial plan, the court must defer to the proposed plan unless the plan does not completely remedy the violation or the proposed plan itself constitutes a section two violation."); *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985)("Thus, even where a legislative choice of policy is perceived to have been unwise, or simply not the optimum choice, absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment."); *McGhee v. Granville Cnty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988) ("[A] reviewing court must ... accord great

ORDER- 19

deference to legislative judgments about the exact nature and scope of the proposed remedy...”); *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 501 n. 5 (7th Cir. 1991) (the court “must, wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, ... with deference afforded the jurisdiction's plan if it provides a full, legally acceptable remedy.... But if the jurisdiction fails to remedy completely the violation or if a proposed remedial plan itself constitutes a § 2 violation, the court must itself take measures to remedy the violation.”); *Tallahassee Branch of NAACP v. Leon Cnty., Fla.*, 827 F.2d 1436, 1438 (11th Cir. 1987) (“[F]ederal courts must defer to the judgment of a state legislative body in the area of reapportionment. Principles of federalism and common sense mandate deference to a plan which has been legislatively enacted.”).

Plaintiff suggests the applicable legal standard in this case is the more stringent one where “[t]he Supreme Court has directed the use of single-member districts to remedy Section 2 violations unless there are compelling reasons not to use them.”[6] (ECF No. 21 at 8-9)(*quoting Montes v. City of Yakima*, 2015 WL 11120964, at *9 (E.D.Wash. 2015)).  However, the broad reach of the Voting Rights Act supports a

---

[6]  The quoted reference from *Montes*, in its entirety, reads as follows: “*When a district court is required to fashion a remedy*, the Supreme Court has directed the use of single-member districts unless there are compelling reasons not to use them.” 2015 WL 11120964, at *9 (E.D.Wash. 2015)(emphasis added).

ORDER- 20

broad view of permissible remedies. To be clear, the Supreme Court has not mandated single-member districts in all instances. It has stated "a *court drawn plan* should prefer single member districts over multi-member districts, absent persuasive justification to the contrary." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)(emphasis added).   Supreme Court precedent does not dictate remedial preferences for legislative bodies; it requires deference to them so long as they meet the special standards that are applicable.

## C. Preemption of State Law

In reviewing a remedial plan, "a district court should not preempt the legislative task nor intrude upon state policy any more than necessary." *Upham v. Seamon*, 456 U.S. 37, 41–42 (1982) (per curiam) (*quoting White v. Weiser*, 412 U.S. 783, 794– 795 (1973)).  This consideration is relevant here, where, state law proscribes at-large general elections. Accordingly, a legislative remedy entitled to deference must not *unnecessarily* conflict with this legislative judgment of the state of Washington.  *See e.g., Large v. Fremont Cnty., Wyo*, 670 F.3d 1133 (10th Cir. 2012)(emphasis added)(affirming rejection of deference to locally-devised plan where County's desired plan unnecessarily conflicted with Wyoming state law).

## D. Totality of the Circumstances

As stated above, the court must consider whether Defendants' remedial plan is legally unacceptable because it fails to remedy the particular dilution violation or

violates anew constitutional or statutory voting rights. This evaluation requires the court to consider "the totality of circumstances," 52 U.S.C. § 10301(b), through "a searching practical evaluation of the past and present reality and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (internal quotations and citation omitted). The typical factors which may be probative of a violation of § 2 are:

(1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;"

(2) "the extent to which voting in the elections of the state or political subdivision is racially polarized;"

(3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;"

(4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process;"

(5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;"

(6) "whether political campaigns have been characterized by overt or subtle racial appeals;"

(7) "the extent to which members of the minority group have been elected to public office in the jurisdiction;"

(8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and

(9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles*, 478 U.S. 30, 45 (1986) (quoting Senate Judiciary Committee's Majority

Report contained in bill amending Voting Rights Act).

The most relevant of the so-called "Senate Factors" in the liability phase of this litigation were the second and third factors. Where the enacted remedial plan has not been utilized and there is no history by which to analyze the scheme, a mechanical review of these factors does not aid the court in determining whether the proposed plan meets the requirements of § 2. *Hines v. Mayor and Town Council of Ahoskie*, 998 F.2d 1266, 1272 (4th Cir. 1993). The pertinent factors are addressed in the Analysis, Section IV, below.

**E. At-Large Plans are not Per Se Illegal**

Both parties acknowledge that at-large plans are not per se unlawful. *Gingles*, 478 U.S. at 46 ("[E]lectoral devices, such as at-large elections, may not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process."). "At-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme." *U.S. v. Dallas Cnty. Comm'n, Dallas Cnty., Ala.*, 850 F.2d 1433, 1438-39 (11th Cir. 1988) (citation and quotations omitted).

## IV.   ANALYIS – REMEDIAL PLAN

The gravamen of the § 2 violation herein is that the Pasco City Council has until now operated under an at-large "place system" for electing *all seven* City Council

ORDER- 23

seats in a place where the voices of minority voters in a racially polarized electorate have been drowned out by the will of majority voters.  The City's enacted remedy is the court's starting point.

The court begins with a look at how political life in Pasco would structurally differ under the City's hybrid 6-1 remedial plan.  First, Pasco's plan provides Latinos with "rough proportionality" in their voting influence, in that it provides for three majority-minority districts, instead of the former two.  *See Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994)(describing majority-minority districts as remedial devices relying upon a "quintessentially race-conscious calculus aptly described as the 'politics of second best.'").  Next, whereas run-off primaries (district-based for 5 position) combined with at-large elections previously determined all *seven* positions, the 6-1 plan provides for six single-member district-based general elections, instead of none. As before, Position 7 remains at-large, untied to any district and elected by the citywide population.  Pasco residents would have the opportunity to run or vote for just two positions on the Council, instead of all seven under the former election scheme, or just one under Plaintiff's proposal. Thus, the new election scheme retains its use of numbered positions, a top-two primary, and majority vote general elections, but limits their application to specifically drawn districts for all but one seat.

The court's task is to determine whether, under the totality of the circumstances

ORDER- 24

present in Pasco, this combination of single district elections and a single at-large position, viewed as a whole (and not simply focusing on the one at-large seat), offers a complete remedy and provides undiluted opportunity for Latino citizens to participate in the political process and to elect candidates of their choice.

The Defendants contend the City's 6-1 hybrid plan complies with the law and was the result of a policy judgment, not an arbitrary choice or any intent to continue discriminative past practices. The only aspect of the City's plan Plaintiff contests is its at-large component for Position 7. Plaintiff contends the total elimination of any at-large component in the election system is necessary to "completely" and "fully" remedy the § 2 violation. In Plaintiff's view, the retention of any at-large seat puts that seat currently "functionally off-limits" to Latino voters, ECF No. 27 at 6, whereas her proposed single-member plan would "provide Latinos with *immediate influence*" in a fourth district. (ECF No. 31 at 2).

The nature of Plaintiff's challenge to Pasco's remedy expands upon its challenge to the former election scheme. Whereas Plaintiff contended the former at-large election scheme impeded the ability of Latino voters to elect representatives of their choice, i.e. their ability to *determine* city council elections, Plaintiff's argument now includes the contention that the remedy is unlawful because the citywide post impairs Latinos' ability to *influence* the outcome of the single position on the Council. This type of "influence dilution" claim is addressed in the totality of

circumstances analysis that follows.

**A. Proportionality**

Defendants emphasize that the City's remedial plan has reconfigured the residency districts to achieve "rough proportionality," where Latinos are a majority of the registered and eligible voting populations in three districts (or 42.85% of the total seats).   This is a higher proportion than the Latino share of the citywide voting age population, 38.5%.  The Supreme Court has noted that "'[p]roportionality' as the term is used [in the totality of circumstances analysis] links the number of majority-minority voting districts to minority members' share of the relevant population." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). Proportionality has evolved from relevant evidence for liability determinations in § 2 cases, to a convenient, frequently used redistricting tool aimed to redress vote dilution.  Both proposals before the court recognize the creation of three majority-minority districts provides Latinos with a realistic opportunity to elect representatives of their choice. This is "obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and elect representatives of their choice.'" *De Grandy*, 512 U.S. at 1020.

Nevertheless, the Supreme Court has admonished that while proportionality is always a relevant factor in the totality of the circumstances inquiry, the court is not

ORDER- 26

to place undue emphasis on it. *LULAC v. Perry*, 548 U.S. 399, 436 (2006).   This is because there is no general requirement that all remedies include rough proportionality (although the facts may dictate it, as they do here), proportionality may not be used as a safe harbor, and it is "not to be pursued at the cost of fracturing effective coalitional districts."  *Covington v. North Carolina*, 316 F.R.D. 117, 133 (M.D.N.C. Aug. 11, 2016)(appeal pending); *see also, U.S. v. Euclid City School Bd*, 632 F.Supp.2d 740, 753 (N.D.Ohio 2009) (rejecting assertion that a remedy must result in roughly proportional representation, as "[s]uch a contention confuses the use of proportionality as one tool through which a reviewing court determines the possible existence of vote dilution on the one hand, with a guarantee of proportional representation on the other ... [t]he former is common sense, the latter is prohibited by statute.").

The degree of value assigned to proportionality may vary with the facts. Undoubtedly, Pasco has considered its neighbor's experience in devising a remedy with proportionality in this case. In *Montes v. City of Yakima*, the mechanism diluting the Latino vote was identical to that in this case: a numbered place system with an at-large "city-wide majority takes all election" for all seven city council seats. 2015 WL 11120964, *2 (E.D.Wash. 2015).  The City of Yakima had proposed a remedial electoral system that would include five single-member district positions and two at-large positions.  *Id*. at *2.  Under the proposal, the two at-large positions

would be filled in a single election by way of "limited voting" and without a primary. "Instead, each candidate who filed for office would appear on a single-ballot at the general election," and "each voter in the City would cast a single vote for any of the candidates listed." *Id*. The two candidates garnering the most votes would be elected. *Id*. The court concluded the City's proposal was not entitled to deference as it was neither "effective" nor a "full" remedy for several reasons. First, Yakima's proposal posed unnecessary conflicts with state law mandating primaries. *Id*. at *5-*7. Second, it failed to provide rough proportionality.[7] *Id*. at *8. These facts distinguish this case from *Montes* and other cases[8] Plaintiff cites in a significant way.

---

[7]  The *Montes* decision explains that Yakima had asserted the Latino citizen voting age population in Yakima was 22.97%, which meant "Latinos should, mathematically, hold 1.6 seats [on the seven member council] to be proportional to their share of the CVAP." *Montes*, 2015 WL 11120964, *8. The city's plan only provided one majority-minority district. *Id*. The court concluded the City's plan failed to accord proportionality because "Defendants' proposal only gives the Latino population an opportunity to attain one of the seven seats." *Id*. The court concluded proportionality was a "significant indicator of whether an electoral plan provides an adequate remedy…" *Id*.

[8]  Rough proportionality was also absent in both of the rejected legislated hybrid proposals in *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038 (8th Cir. 1997) and *U.S. v. Osceola Cnty, Fla*, 474 F.Supp.2d 1254, 1256 (M.D. Fla. 2006).

ORDER- 28

This factor favors Pasco's remedy; however, the analysis must proceed because proportionality is not the end-all be-all test for the remedy of a violation of § 2.

## B. Racial Polarization

It has been stipulated and this court has found that voting in Pasco evidences racial polarization.  In § 2 cases, racially polarized voting simply means that "the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates."  *Gingles*, 478 U.S. at 62. It "is the *difference* between choices made by [minorities] and whites – not the reasons for that difference" *Id*. at 63.

The court rejects Plaintiff's invitation to hold that the findings on liability, including the existence of racially polarized voting, automatically dictates the eradication of all at-large seats for the Pasco City Council. *See* ECF No. 21 at 10. None of the cases cited by Plaintiff support such a bright-line rule. Such an interpretation would eliminate either court or legislative discretion and simply wrap municipalities and "United States District Judges in a 'single-member strait jacket.'" *Paige v. Gray*, 437 F.Supp. 137, 171 (M.D.Ga. 1977); *see also*, *U.S. v. Maregno Cnty. Comm'n*, 643 F.Supp. 232 (S.D.Ala. 1986), *aff'd*, 811 F.2d 610 (11th

Cir.1987)(stating this interpretation "would annihilate a court's ability to examine on an ad hoc basis the totality of the circumstances presented and thereby to fashion an equitable remedy which does not intrude upon state policy more than necessary to meet the specific constitutional violations involved.").

The impressive body of voting rights jurisprudence confirms that relief against racially polarized bloc voting can utilize a hybrid election scheme without violating § 2. *See e.g., Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000)(en banc)(finding no clear error in district court's decision holding that county's use of at-large election scheme did not violate § 2, despite high degree of racially polarized voting and "vestiges of official discrimination" in the county); *Tallahassee Branch of NAACP v. Leon Cnty., Fla.*, 827 F.2d 1436 (11th Cir. 1987), *cert. denied*, 488 U.S. 960 (1988) (affirming deference to legislatively adopted mixed plan consisting of five single-member districts and two at large); *Calderon v. Ross*, 584 F.2d 66 (5th Cir. 1978), *modified on rehearing*, 589 F.2d  909 (1979) (approving 5-2 plan); *Paige v. Gray*, 473 F.Supp. 137, 158 (M.D.Ga. 1977)(approving court-devised 6-1 hybrid remedial plan for city commissioners of the city of Albany, Georgia, allowing retention of a single at-large position slotted for the mayor); *U.S. v. Euclid City School Bd.*, 632 F.Supp.2d. 740 (N.D.Ohio 2009)(approving city school board's limited voting proposal and retention of at-large elections as remedy for § 2 violation); *U.S. v. City of Euclid*, 523 F.Supp.2d 641

ORDER- 30

(N.D.Ohio 2007)(remedying the §2 violation by replacing multi-seat at-large contest with hybrid 8-1 remedial plan providing eight single-member districts while retaining at-large council president position) ; *N.A.A.C.P. v. Kershaw Cnty., S.C.*, 838 F.Supp. 237 (D.S.C. 1993)(accepting hybrid remedial plan arising out of at-large method of electing members of city council with six single member districts and at-large election of chair of county council); *East Jefferson Coalition for Leadership and Development v. Parish of Jefferson*, 703 F.Supp. 28 (E.D.La. 1989)(approving 7-member council with six single–district members and one at-large member was sufficient to give voters a "realistic ability to influence the outcome of…elections," despite the fact none of the single-member districts created by the defendants' plan had a majority of African-Americans); *James v. City of Sarasota, Fla.*, 611 F.Supp. 25 (M.D. Fla. 1985) (approving mixed plan submitted by city with two commissioners elected at-large by plurality vote); *N.A.A.C.P. v. City of Statesville, N.C.*, 606 F. Supp. 569 (W.D.N.C. 1985) (approving jointly proposed replacement for at-large method of election with hybrid 6-2 plan, combining six district and two at-large voting methods); *Vecinos DeBarrio Uno et al., v. City of Holyoke et al*, 960 F.Supp. 515 (D.Mass. 1997)(holding that totality of circumstances established that city's hybrid ward and at-large voting system for city council did not deny Hispanics meaningful access on account of race and recognizing favorable policy underlying at-large component insuring representation

ORDER- 31

on behalf of the community as a whole).

Though legally and statistically significant evidence of racial bloc voting exists in this case, voting is rarely, completely polarized.  Dr. Engstrom analyzed eight primary and general election City Council contests from 2005, 2009, and 2015, the last three election cycles that presented voters with a choice between or among Latino and non-Latino candidates.  (ECF No. 23 at ¶ 6).  Racially polarized bloc voting existed in five of the contests, where Hispanic candidates received support from an estimated 58.3% to 86% of Latino voters compared to only 7.1% to 39.5% of non-Latino voters.  Racially polarized voting occurred in *both* the district-based primaries and in the 2015 at-large general elections.

Five futile elections is enough to establish legally significant evidence of racially polarized voting in Pasco.  However, minority cohesion and polarized voting was not present in the three contests in 2005.  For example, that year, Joe Cruz was the Latino candidate for at-large Position 7.  In the primary, he received 48.2% of the Latino and 33.7% of the non-Latino vote.  He lost the general election by just 53 votes, and received an estimated 40.7% of the Latino vote and 49.7% of the non-Latino vote.  (ECF No. 23 at ¶¶23-24).   Other election evidence that non-Latino voters are willing to support Latino candidates exists, including in the 2015 primary election, where Latino candidates received 39.5% of the non-Latino vote.  (ECF No. 23, Table).

ORDER- 32

Though isolated election observations do not undermine § 2 liability, the evidence pertaining to polarization involves patterns that are not consistently extreme (such as 90% favoring one candidate and 90% favoring another). The evidence also does not suggest there are insurmountable barriers to coalition building.  Expert evidence on citywide and district crossover voting is somewhat sparse,[9] however, at oral argument both parties acknowledged crossover voting and the potential for coalition building exists.

The evidence that voting in Pasco tends to be racially polarized, the degree of political cohesion, and the evidence of crossover voting factor into the court's totality of the circumstances analysis and decision.

**C. Compact vs. At-large; Size of the District and Influence**

In both Defendants' and Plaintiff's plans, Latinos are in the minority in four out of seven positions and their "political fortunes remain tied to the interests of other voters."[10] *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004).  Plaintiff contends the

---

[9]  Defendants' expert does indicate that the rationale for the 6-1 plan includes that "current and anticipated future numbers assure Latinos across the city the increasing prospect of forming useful coalitions with non-Latino voters to elect a fourth favored candidate of choice."  (ECF No. 26, Ex. 3 at ¶ 11).

[10]  The court notes that in the three districts where Latinos are not a majority, the Latino voter demographics are not insignificant fractions.  *See Appendix A*. Using

ORDER- 33

"one difference" between the two proposals is that the City's at-large position denies Latinos the "meaningful opportunity to win election now" (ECF No. 31 at 9) whereas a compact district would provide for the "immediate removal of dilutive effect." (ECF No. 31 at 7).  If Plaintiff's argument is that the very existence of one at-large position will enable the white majority voters of Pasco to control four Council seats instead of three, this proposition is akin to arguing Latino votes will be diluted unless their effect is maximized.  But the law does not require such a result.  Dilution cannot be inferred from the mere failure to guarantee minority voters maximum political influence. *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). Nothing in the Voting Rights Act requires maximizing possible voting strength.

Indeed, there are no legal benchmarks for this court to compare and determine how much influence a minority group should have.  Even if having a smaller residency district could increase a minority group's influence, it is difficult to discern when an at-large component causes legal injury by diluting the minority group's influence and when the minority group is merely seeking more influence than is

the 2010-2014 5-year ACS estimates, which do not account for Pasco's city limits, Defendants' expert estimates the LCVAP as: 27.3% (District 3); 23.6% (District 4); and 13.0% (District 5)). Defendants estimates the current percentage of Latino registered voters (based upon 2016 data) for these districts are: 41.4% (District 3), 40.9% (District 4), and 38.2% (District 5),  (ECF No. 33, Ex. 1)

legally guaranteed.    The Supreme Court has repeatedly avoided ruling on the viability of influence dilution claims.

The goal of § 2 is not to guarantee success at the polls for minority-preferred candidates but to provide assurances of fairness in the electoral process. *De Grandy*, 512 U.S. at 1014; *see also*, *Nevett v. Sides*, 571 F.2d 209, 236 (5th Cir. 1978)("the equality involved is the equal opportunity to elect representatives. It is an effective equality, although not a guarantee of equality of result after all, the right to vote was protected, not the right to vote for the winning candidate."). The guarantee of § 2 is that a minority group will not be denied, on account of race or color, the ability "to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993).  As a result, the question here is not whether the Latino-preferred candidate will be elected to the at-large position, but whether the at-large component would give Latinos less opportunity than others in the electorate to form a majority and participate in the political process.

A minority group that is too small to form a majority may be able to join with other voters to elect a candidate it supports. However, such groups will be obliged "to pull, haul, and trade to find common political ground" with other voters in the district. *De Grandy*, 512 U.S. at 1020.   At this moment in time, this dynamic exists in both Pasco's at-large position and Plaintiff's proposed "influence district" (Position 5), where the Latino population is in the minority.  Whereas, the citywide

ORDER- 35

Latino share of registered voting population is approximately 30% (*compare* ECF No. 21-2 at 3 (29.81%) with ECF No. 33-1 at 4 (31.8%)), the LCVAP in Plaintiff's proposed residency district is estimated to be 27.25%, which Plaintiff concedes is at least "comparable" (ECF No. 31 at 8) to the citywide statistic.  Based upon trends showing an ever increasing Latino voting age population, both parties predict these levels of influence increasing and shifting over the next decade.  The court cannot and need not decide which seat (Defendants' Position 7 or Plaintiff's Position 5) will most quickly accommodate favorable change for Latinos in Pasco.

Plaintiff contends more difficult coalition-building, socioeconomics and cost are the reasons Latinos do not "have an opportunity to influence or win elections…in an at-large setting." (ECF No. 31 at 8).  A socioeconomic disparity between Latinos and non-Latinos exists in Pasco. (ECF No. 24, Ex. B).  This disparity also presents itself geographically "between predominantly Latino east Pasco and predominantly White west Pasco."  (ECF No. 24 at 21, ¶59).

Plaintiff's expert Mr. Cooper opines that "the geographic and socio-economic divide would disadvantage campaign funding and get-out-the vote efforts for Latino candidates in an at-large election compared to an election in a geographically smaller and less populous single-member district." (ECF No. 24 at 21, ¶ 60). *See also,* ECF No. 27 at 10-11, ECF No. 28 at ¶ 19.  These contentions are commonly made in voting rights cases.  Generally speaking, many features of our political system, such

as majority vote requirements and the high costs of campaigning, combined with socio-economic disparities, often affect access to the political process.

Socioeconomic disparities alone do not show that minorities do not have equal access to the political process. *Veasey v. Abbott*, 830 F.3d 216, 275 (5th Cir. 2016). Evidence that might suggest socioeconomic disparities impede electoral participation include reduced levels of voter registration, lower voter turnout among minority voters, costly campaign financial expenditures for at-large elections, evidence of minorities being discouraged from running for office because of the cost of an at-large campaign, or evidence minority voters are hindered in registering, casting ballots, qualifying to run, and campaigning for public office. The parties have not offered this evidence. Instead, the record suggests that Latinos have run for political office in Pasco and, as Plaintiff indicates, "…the Latino community…has repeatedly *produced and supported* candidates for office." (ECF No. 21 at 3 (emphasis added)). This does not suggest a lack of access to the political process. Though socioeconomic impediments no doubt exist, the court finds there is an insufficient basis to conclude that socio-economics and cost would be significant impediments to Latino participation in the single at-large election provided for in the City's remedial plan.

As for the potential for coalition building, there is plenty of room for disagreement. Plaintiff contends coalitions are more likely to occur and to assist

ORDER- 37

Latino voting strength in a compact district where voters are "more likely to find common ground" because "they share common interests driven by geography: their children attend the same schools and play in the same parks they use the same libraries and roads, and they walk under the same streetlights."  (ECF No. 31 at 8).  However, critics of pure district-based election forms cite the fact they can produce a balkanizing effect, splintering communities and having the unintended effect of increasing racial divides. The Supreme Court has warned about these social and political costs of dividing communities along racial lines in the name of improving electoral systems. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 657 (1993) (observing that "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters…").   Considering the shape of Plaintiff's District 5 (Appendix B and ECF No. 24 at 13), it is reasonable to question how the shape and size of that geographic unit would encourage a greater sense of cohesion or shared identity over that of the city at-large. *See discussion*, Lani Guinier, Groups, Representation, and Race–Conscious Districting: A Case of the Emperor's Clothes, 71 TEX. L.REV. 1589, 1603 (1993).

Defendants counter that the proposed single at-large position is "the next-best electoral opportunity" for Latinos in Pasco. They contend the inclusion of the at-large district: 1) provides "city-wide representation and accountability"; 2) avoids

ORDER- 38

the "political 'balkanization' that can occur in exclusively single-member district cities and provide greater city-wide unity"; 3) gives "candidates the option to run for one of two seats"; 4) "double[s] the number of times a given citizen could vote for representation on the council"; 5) gives "Latinos who reside in non-majority-minority districts an eventual opportunity to elect their candidate of choice, whereas Latinos in an exclusively SMD plan may never have that opportunity if they reside in a non-majority-minority district"; and 6) provides "more flexibility to address the City's changing demographics during periods in between redistricting." (ECF No. 30 at 7-8).  Defendants' expert also explains that "[s]cholarly studies suggest that these new prospects – three 'opportunity districts' plus a fourth citywide 'influence' opportunity – might energize Latinos to register and turn out to vote in future elections" as competitiveness has been shown to be "among the strongest correlations of voter turnout." (ECF No. 26, Ex. 13 at ¶ 12).

These competing contentions are an inescapable part of redistricting controversies.  While vote dilution is a comparative inquiry, the court must be cautious not "pre-empt" the legislative task. *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (plurality) (White, J.).  The essence of Plaintiff's attack on the single at-large position is that it fails to maximize Latino influence for purposes of forging an advantageous coalition.  *Given the facts herein*, most importantly the redesign of the election scheme for the other six districts, the court is not persuaded that the size or

ORDER- 39

at-large nature of Position 7 adversely affects Latino potential to form a majority any more or less than a seventh compact district would.

### D. Majority Vote Requirement and Anti-single Shot Provisions

Dr. Engstrom identifies the majority vote requirement and inability to engage in "bullet" or "single shot" voting[11] as "two features of the at-large arrangement which enhance the ability of a majority of voters to dilute the votes of the Latino minority in Pasco."  (ECF No. 23 at ¶ 10). These features persist in both proposals whether the election is district-based or includes an at-large component.    However, the dilutive effects of these features are minimized where there is only a single at-large position, compared to an at-large election for every seat (the arrangement Dr. Engstrom was referring to in his report). In a majority rule system there will always be an inherent disadvantage to the minority struggling for political power.

### E. Tiebreaks

Plaintiff contends the problem with the retention of an at-large position is

---

[11] With single-shot voting, "a group of voters can cast[] one vote, if they wish, for the candidate favored by the group, and not cast[] any of their remaining votes for any other candidate. By withholding their remaining votes from the candidates competing with their preferred choice, minority voters have a better chance to finish among the top…candidates and win one of the…seats." (ECF No. 23 at ¶ 26).

ORDER- 40

compounded by the fact that geographic districts are evenly split between three majority-Latino and three majority-White districts. Plaintiff speculates that with this even split, the at-large position will become a "critical" "swing vote" or "decisive vote" on issues "on which the two populations are divided." (ECF No. 27 at 11-12). This court is unwilling to make a speculative assessment on the outcome of political events based upon the odd number of seats and number of majority-minority districts, especially considering the court's analysis is focused upon ensuring opportunity, not control. There is no evidence that any member of the City Council, including the selected mayor, has more power or authority than any other member. Unlike in the case cited by Plaintiff, *Harper v. City of Chicago Heights*, 223 F.3d 593, 600 (7th Cir. 2000), the position of mayor is not slotted for the at-large position and there is no evidence of the frequent needed for a tie-breaking vote. Nor can the court anticipate there will be tie votes where there is no evidence suggesting that elected officials are unresponsive to the needs of the minority community or that representatives are politically unresponsive to Latino voter interests. Here, there simply is no risk of the "*unacceptable* gravitation of power" to any single position. *Dillard v. Crenshaw Cnty.*, 831 F.2d 246 (11th Cir. 1987)(emphasis added)(rejecting at-large chairperson position on the Council given the possibility of an unacceptable gravitation of enhanced power to the position and ultimately agreeing upon a rotation feature).

ORDER- 41

**F. Policy**

Policy considerations certainly counsel restraint in this case.

There is no evidence that the policy behind Pasco's remedial plan is tenuous. The court has carefully considered the stated rationale underlying the legislative provision for the City's plan, to wit: 1) "its providing three Latino citizen-voter-age majority districts, the same number as possible under the ACLU's preferred seven district plan;" 2) "the plan providing greater opportunities for voters to influence the number of elections for members of the City Council and for voters to have the opportunity to run for seats on the City Council"; and 3) "the possibility of greater continuity of government and ease in implementation."  (ECF No. 26, Ex. 10 at 2). There is no basis for this court to question the reasonableness of these stated interests and indeed, these are considerations that one would expect to give guidance in a remedial election scheme.

Municipal election systems with at least one at-large component are extremely common nationwide and used in nearly all of Washington's code cities for their city councils. (ECF No. 25 at 22, n. 20, citing http://mrsc.org/getdoc/c86e1df6-57ae-407e-ac6a-be4d0f0b28c1/Council-Election-by-Wards-or-Districts.aspx).  State law, as it applies to Pasco, expresses a clear preference for at-large city councilmember

elections.   The flexibility in election forms that many other states[12] have long accorded their municipalities, supports the obvious fact that one form does not suit all.  Each form has possible advantages and disadvantages.  *See City of Tucscon v. State*, 229 Ariz. 172, 174 (2012) (Arizona Supreme Court recognizing that "although at-large members are responsible to electors in the entire city, this may diminish attention to the interests of particular neighborhoods or groups; district-based elections, in contrast, assure representation from different geographic areas but may elevate particular interests over citywide ones.").  The fact Washington State has maintained laws imposing an at-large electoral scheme on municipalities is a factor this court considers in the calculus here. *Houston Laywers Ass'n v. Attorney General of Texas*, 501 U.S. 419, 426-427 (1991)("[T]he State's interest in maintaining an electoral system…is a legitimate factor to be considered by courts among the totality of circumstances…").

### G. Totality of the Circumstances

Changes in an election system invariably bring about results that cannot be predicted with any degree of accuracy. When placed in the position of reviewing a legislatively enacted remedial plan which has yet to be locally tested, the court must

---

[12] *See e.g.,* Ariz.Rev.Statutes §§ 9–232.04, 9–273 (allowing non-charter cities and towns to choose between at-large and district-based council elections); Fla. Stat., § 124.011.

ORDER- 43

be wary of making predictions, involving itself unnecessarily in political judgments, or directing unnecessary change. All precedent cautions judicial restraint in this area.

Vote dilution cases are circumstantial evidence cases often challenging at-large voting schemes.  While case law offers some direction, it is nearly impossible to locate analogous cases when the test is so heavily fact-driven.  For this reason, the court is unable to "follow in the footsteps of" the six representative cases Plaintiff suggests.  They are all inapposite because they involved different legal standards applicable to judicially ordered plans,[13] or involved legislative proposals lacking proportionality,[14] or occurred in places with significantly more deplorable histories of "open and unabashed" discrimination in all areas including the voting laws

---

[13] *See e.g., U.S. v. Dallas Cnty Comm'n, Dallas Cnty., Ala*, 850 F.2d 1433, 1438-39 (11th Cir. 1988) (judicially created plan imposed remedy creating five single-member districts, including one "swing" district, where there was strong evidence African American candidates would not be able to compete for an at-large seat); *Chapman v. Meier*, 420 U.S. 1 (1975)(striking down court-ordered reapportionment that had a total deviation of 20.14%).

[14] *Montes v. City of Yakima*, 2015 WL 11120965 (E.D.Wash. 2015); *U.S. v. Osceola Cnty, Fla*, 474 F.Supp.2d 1254, 1256 (M.D. Fla. 2006).

ORDER- 44

themselves, economics and social life.[15]   Even in the case of *Williams v. City of Texarkana, Ark.*, 861 F.Supp. 771 (W.D.Ark. 1993), where it was agreed the remedy would be judicially imposed, the court did *not* hold that the City's proposed 6-1 plan was unlawful or would not remedy the Voting Rights Act violation. 861 F.Supp. at 772 (W.D.Ark. 1993)(deciding the 7-0 plan was the plan "more prudent" because it presented the "greatest potential for" proportionate representation and "less potential for provoking continuing dispute, which would not be in the best interests of the citizens…"); *see also, Williams v. City of Texarkana, Ark*, 32 F.3d 1265 (8th Cir. 1994)(leaving validity of the 6-1 plan, chosen by the electorate after the court imposed the 7-0 plan, for future determination of the district court should a challenge be mounted).

The case law illustrates the fact there is no single "correct" way to design a government; sometimes there are competing interests which can't be reconciled; there is no clear formula as to how much voting strength an individual citizen should have; and it is not the role of the court to "calibrate democracy in the vain search for an optimum solution." *Evenwel v. Abbott,* 136 S.Ct. 1120, 1140 (2016). The "full" and "complete" remedy standard is not a standard that lends itself to application with

---

[15] *Dillard v. Crenshaw Cnty.*, 649 F.Supp. 289 (M.D.AL. 1986)(class action lawsuit involving challenge to at-large systems in nine counties).

ORDER- 45

mathematical exactitude.

In reviewing Pasco's remedial plan the court has considered on one side of the scale lies a history of not a single Latino ever having electoral success in a contested Council election, the presence of racially polarized elections, and a socio-economic divide. On the other side of the scale is proportionality, the absence of discriminatory voting practices and intent, viable policies underlying the 6-1 plan, the participation of Latinos in elections, crossover voting, demographics in a state of flux, and officials' responsiveness.  The court concludes the totality of the circumstances, judged by the record before this court, make it possible to reconcile the retention of a single at-large seat. Under Pasco's remedial plan, Latinos possess an equal opportunity to elect representatives and to participate in the political process, which was previously denied to them under the all at-large election scheme.

The City's plan complies with the "full and complete" remedy standard and does not violate the Constitution or Voting Rights Act anew. Accordingly, the court defers to the City's plan.

## V.    IMPLEMENTATION

The Pasco City Council did not vote on how the proposal should be implemented, leaving this decision to the court. The court orders immediate implementation and orders that every seat be up for election in 2017, with four positions (Positions 1, 3, 4 and 6) elected to a 4-year term, and for this election only,

3 positions (Positions 2, 5 and 7) elected to a 2-year term of office. Prompt implementation is required for an effective remedy. This was recognized by the parties in the Partial Consent Decree and briefing schedule in this case. This option assures citizens will have their voices heard now.

## VI.    INJUNCTION

Plaintiff has proposed that the court order that the "City of Pasco is permanently enjoined from administering, implementing or conducting any future elections for the Pasco City Council in which members of the City Council are elected on an at-large basis, whether in a primary, general, or special election."    The court denies this request.  Future redistricting shall be done in a manner that complies with the terms and intent of this Judgment and the Partial Consent Decree entered on September 2, 2016, and otherwise complies with the provisions and requirements of the Voting Rights Act, 52 U.S.C. § 10301 et seq.

## VII. CONCLUSION

The task before the court is not one it has taken lightly. These issues do not lend themselves to easy analysis and no court has devised a formula to resolve the question of where the ideal solution lies for Pasco.  Complicating the analysis, the facts are in a constant state of change. Legislative apportionment is an issue which justifies ongoing evaluation and adjustment by the executive and legislative branches of government, if necessary.    Washington state law makes these

adjustments more difficult and less likely to occur voluntarily. For some concerns, a judicial remedy is absent and "relief must come through an aroused popular conscience that sears the conscience of the people's representatives." *Baker v. Carr*, 369 U.S. 186, 269 (1962).

As a final note, the court commends the parties and the ACLU for their collaboration prior to and subsequent to the filing of this lawsuit. Through their sincere cooperation, most importantly, this case has been decided in time to effectuate change before the next election.

**ACCORDINGLY, IT IS HEREBY FINALLY ADJUDGED AND ORDERED:**

1. Plaintiff's Motion for Entry of Plaintiff's Proposed Remedial Plan (**ECF No. 21**) is **DENIED**. Defendants' Motion for Entry of Proposed Remedial Plan and Final Injunction (**ECF No. 25**) is **GRANTED**.

2. The court herein approves, as a remedy for the § 2 violation, the City's remedial plan and the map reproduced in Appendix A.

3. The City of Pasco is ordered to take all steps necessary to implement the plan in order to place all seven positions up for election in 2017 and thereafter, provided, however, that the City may revise the districts based on annexations, deannexations, and population changes reflected in the decennial census and at appropriate times in the future when necessary to conform to the law.

ORDER- 48

4. In order to preserve the current staggered election plan for members of the City Council, Positions 1, 3, 4 and 6 will be elected for a four-year term. Positions 2 and 5 and the at-large seat (Position 7) will be initially elected to two-year terms and thereafter to four-year terms.

5. This decision and separately entered Judgment is binding upon all parties and their successors. Future redistricting shall be done in a manner that complies with the terms and intent of this Order and the Partial Consent Decree entered September 2, 2016, and complies with the Voting Rights Act.

6. Without affecting the finality of this final decision and its associated Judgment, the court retains jurisdiction of this cause through 45 days after the certification of the 2017 general election for the purpose of enforcing its orders, and if necessary, for the disposition of any remaining unresolved issues.

The District Court Executive is hereby directed to enter this Order, enter Judgment accordingly, and provide copies to counsel.

DATED THIS 27th day of January, 2017.

*s/Lonny R. Suko*

_____
LONNY R. SUKO
SENIOR U.S. DISTRICT COURT JUDGE

ORDER- 49

# APPENDIX A

# City's Proposed Plan



| Plan M8 | | | | |
|---|---|---|---|---|
| District | Total CVAP (2010-14) | Hispanic CVAP | Total Pop (2010) | % Hispanic CVAP |
| 1 | 3,148 | 1,701 | 10,048 | **54.0%** |
| 2 | 3,488 | 1,825 | 10,009 | **52.3%** |
| 3 | 7,828 | 2,136 | 10,532 | 27.3% |
| 4 | 6,535 | 1,542 | 10,062 | 23.6% |
| 5 | 7,744 | 1,007 | 11,003 | 13.0% |
| 6 | 3,998 | 2,239 | 10,798 | **56.0%** |
| **Total** | **32,742** | **10,450** | **62,452** | 31.9% |
| *Total deviation from ideal:* | | | | *9.55%* |
| Note: Equalizes 2010 population (census enumerated) within 2016 city limits. | | | | |

# APPENDIX B



Pasco -- 7 Districts
Water Area
Highway
District
1
2
3
4
5
6
7
0
.4
.8
1.2
Miles
Plaintiff's Remedial Plan
HILLCREST DR
PHEASANT RUN
RICKY RD
QUAIL RUN RD
KOHLER RD
RD 116
DENT
IRIS LN
DESERET DR
KAU TRL
QUAIL RD
ROBERTA RD
MELODY LN
N RD 44
N RAILROAD AVE
E FOSTER WELLS RD
FOSTER WELLS RD
N GLADE RD
INDUSTRIAL WAY
US HWY 395
RAILROAD AVE
4TH AVE
CAPITOL AVE
NORFOLK DR
EDELMAN RD
MIA LN
MIDLAND LN
RD 92
RD 90
STUTZ DR
CORD DR
CHEHALIS LN
ENTIAT CT
POWERLINE RD
N RD 68
THREE RIVERS DR
SANDIFUR PKY
N RD 58
N RD 56
CURLEW LN
RD 52
PORTO LN
HARRIS RD
SAVARY DR
SATURNA DR
QUADRA DR
LATIMER CT
I 182
RUTH DR
CANDLESTICK DR
LUCENA DR
MONTEREY DR
BURDEN BLVD
ADOBE DR
SEDONA DR
HORIZON DR
SHORELINE CT
CRESCENT RD
CORONADO ST
CAMPOLINA LN
HOMERUN RD
SALEM DR
SAHARA DR
SONORA DR
MOJAVE DR
INDIAN RIDGE DR
RD 36
ROCKWELL AVE
FAIRCHILD ST
JASON AVE
STEARMAN AVE
BAKER ST
KING ST
RD 106
WILLOW WAY
COURT ST
PRAIRIE LN
SUNSET TRL
CHAPEL HILL BLVD
WOODBINE DR
BELL ST
ARGENT ST
RD 61
RD 44
ARGENT PL
YARNEY LN
ARGENT RD
SUN WILLOWS BLVD
RAINIER AVE
N RD 96
FRANKLIN RD
RD 76
RD 64
W DRADIE ST
W LIVINGSTON RD
MELVILLE RD
RICHARDSON RD
WERNETT RD
US HWY 12
N OREGON ST
RD 88
RD 84
RD 80
CHIWANA DR
SUNSET LN
RD 72
RD 68
RD 67
RD 60
W LEOLA ST
PEARL ST
W ELLA ST
W JAY ST
20TH AVE
N 18TH AVE
N 12TH AVE
EMPIRE DR
N 10TH AVE
N 6TH AVE
N 4TH AVE
SHEPPERD ST
DIETRICH RD
AGATE ST
W AGATE ST
N 37TH PL
RD 56
N 23RD AVE
RD 77
ZINNIA CT
IVY LN
CHRISTOPHER LN
RD 62
RD 59
RD 54
MARIE ST
W MARIE ST
RD 40
HENRY ST
BROWN ST
W HENRY ST
N 3RD AVE
N 1ST AVE
E BROADWAY ST
E ADELIA ST
N CEDAR AVE
E LEWIS ST
SYLVESTER ST
NIXON ST
PARK ST
D ST
RD 34
N RD 32
RD 28
N RD 26
24TH AVE
W NIXON ST
W SHOSHONE ST
E LEWIS PL
COMMERCIAL AVE
RD 49
RIVERHAVEN ST
W YAKIMA ST
W HOPKINS ST
S FRONT AVE
S WEHE AVE
BEECH AVE
S SYCAMORE AVE
CEDAR AVE
ANACONDA AVE
TIERRA VIDA LN
US RT 395 S
ATOM DR
S 25TH AVE
W LEWIS ST
W LENA ST
S 13TH LN
W A ST
S 5TH AVE
S 1ST AVE
A ST
E B CIR
W WASHINGTON ST
S MAITLAND AVE
S 10TH AVE
E WAREHOUSE ST
E DOCK ST
SE RD 33
S RD 40 E
3RD ST
7TH ST
E COMMERCE ST
SACAJAWEA PARK RD
182
395
12
240
397

# Population Summary Report

**Pasco City Council  --Plaintiff's Remedial Plan -- 7 districts**

| District | Population | Deviation | % Deviation | Latino | % Latino | NH White | % NH White | % Latino of all citizens |
|----------|-----------|-----------|-------------|--------|----------|----------|------------|--------------------------|
| 1 | 8724 | -198 | -2.22% | 7292 | 83.59% | 1074 | 12.31% | 74.86% |
| 2 | 8865 | -57 | -0.64% | 7289 | 82.22% | 1214 | 13.69% | 72.78% |
| 3 | 8587 | -335 | -3.75% | 7161 | 83.39% | 1195 | 13.92% | 69.99% |
| 4 | 9026 | 104 | 1.17% | 2495 | 27.64% | 5936 | 65.77% | 30.88% |
| 5 | 8980 | 58 | 0.65% | 4697 | 52.31% | 3816 | 42.49% | 46.11% |
| 6 | 9102 | 180 | 2.02% | 2175 | 23.90% | 6291 | 69.12% | 19.85% |
| 7 | 9168 | 246 | 2.76% | 2626 | 28.64% | 5731 | 62.51% | 31.05% |
| **Total** | **62452** | | | **33735** | **54.02%** | **25257** | **40.44%** | **45.02%** |

**Ideal district size = 8,922**

**Total Deviation**          **6.51%**

| District | 18+_Pop | 18+ Latino | % 18+ Latino | 18+ NH White | % 18+ NH White | % Latino CVAP | % Latino of Registered Voters |
|----------|---------|-----------|--------------|--------------|----------------|---------------|-------------------------------|
| 1 | 5165 | 4062 | 78.64% | 859 | 16.63% | 54.78% | 65.76% |
| 2 | 5596 | 4301 | 76.86% | 1013 | 18.10% | 56.29% | 65.33% |
| 3 | 5187 | 4031 | 77.71% | 995 | 19.18% | 54.08% | 61.73% |
| 4 | 6090 | 1403 | 23.04% | 4318 | 70.90% | 27.37% | 19.25% |
| 5 | 6108 | 2661 | 43.57% | 3091 | 50.61% | 28.98% | 27.25% |
| 6 | 6365 | 1242 | 19.51% | 4703 | 73.89% | 14.24% | 15.45% |
| 7 | 6047 | 1483 | 24.52% | 4043 | 66.86% | 24.04% | 20.36% |
| **Total** | **40558** | **19183** | **47.30%** | **19022** | **46.90%** | **32.02%** | **29.81%** |

     **Note:**

(1)% LCVAP  calculated by disaggregating 2010-2014 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.
(3) Surname match of registered voters as of Nov. 30, 2015